STATE OF CONNECTICUT *v.* ROBERT J. BRETON, SR. (13845)

Peters, C. J., and Callahan, Berdon, Palmer and Foti, Js.

Argued February 7—decision released August 22, 1995

*G. Douglas Nash*, public defender, with whom were *Richard Kelly*, public defender, and *Kent Drager*, assistant public defender, for the appellant (defendant).

*Elizabeth A. Gallagher*, with whom was *William F. Gallagher*, for the appellant (defendant) on the issue of proportionality.

*Harry Weller*, assistant state's attorney, with whom were *John Connelly*, state's attorney, *Judith Rossi* and *Maureen Keegan*, assistant state's attorneys, and, on the brief, *Stephanie Lane*, legal intern, for the appellee (state).

PALMER, J. The defendant, Robert J. Breton, Sr., appeals from a sentence of death imposed after his conviction of capital felony in violation of General Stat-

utes § 53a-54b (8).[1] The defendant was charged with one count of capital felony and two counts of murder in violation of General Statutes § 53a-54a[2] for the intentional killings of his former wife, JoAnn Breton, and his son, Robert Breton, Jr. After a jury convicted the defendant of all counts, a separate sentencing hearing was conducted pursuant to General Statutes (Rev. to 1995) § 53a-46a,[3] at which the same jury considered

---

[1] General Statutes § 53a-54b provides in relevant part: "Capital Felony. A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction."

[2] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . ."

[3] General Statutes (Rev. to 1995) § 53a-46a provides: "Hearing on Imposition of Death Penalty. Aggravating and Mitigating Factors. (a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of . . . a capital felony, the judge . . . who presided at the trial . . . shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, including any mitigating factor set forth in subsection (g), and any aggravating factor set forth in subsection (h). . . . Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty, (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause or, (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been pre-

further evidence. At the conclusion of the sentencing phase of the trial, the jury found an aggravating factor and no mitigating factor. In accordance with the jury's findings, the trial court, *Heiman, J.*, rendered judgment of guilty of capital felony and imposed the death penalty

pared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (h) shall be governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the factors set forth in subsection (h) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury . . . shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury . . . shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor.

"(f) If the jury . . . finds that one or more of the factors set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury . . . finds that none of the factors set forth in subsection (h) exists or that one or more mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release.

"(g) The court shall not impose the sentence of death on the defendant if the jury . . . finds by a special verdict, as provided in subsection (e), that any mitigating factor exists. The mitigating factors to be considered concerning the defendant shall include, but are not limited to, the following: That at the time of the offense (1) he was under the age of eighteen or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so

on the defendant. The defendant appealed to this court pursuant to General Statutes § 51-199[4] and General Statutes (Rev. to 1995) 53a-46b.[5] Because of ambiguities in the special verdict form and the trial court's jury instructions, the record does not establish definitively that the jury verdict purporting to reject the mitigating

impaired in either case as to constitute a defense to prosecution or (3) he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution or (4) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (5) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(h) If no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury . . . finds by a special verdict as provided in subsection (e) . . . (4) the defendant committed the offense in an especially heinous, cruel or depraved manner . . . . "

The legislature has recently repealed § 53a-46a and replaced it with a new death penalty statute, effective October 1, 1995, pursuant to Public Acts 1995, No. 95-19, § 1. Unless otherwise indicated, all references hereinafter to our death penalty statute are to General Statutes (Rev. to 1995) § 53a-46a.

[4] General Statutes § 51-199 provides in relevant part: "Jurisdiction. . . .

"(b) The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony . . . ."

[5] General Statutes (Rev. to 1995) § 53a-46b provides: "Review of Death Sentence. (a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules. In addition to its authority to correct errors at trial, the supreme court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.

"(b) The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating factor specified in subsection (h) of section 53a-46a; or (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

"(c) The sentence review shall be in addition to direct appeal and, if an appeal is taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed and the validity of the sentence."

factors was the result of the jury's unanimous vote. Accordingly, we reverse the judgment with respect to the imposition of the death penalty and remand for a new sentencing hearing.[6]

The jury reasonably could have found that the following facts were adduced at the guilt phase of the trial. The defendant and JoAnn Breton were married in 1967, and had one child, Robert Breton, Jr. In January, 1987, JoAnn Breton was divorced from the defendant. Shortly after the divorce, JoAnn and Robert Jr., then fifteen years old, moved to a two-story apartment located in Waterbury.

On Saturday, December 12, 1987, at approximately 10 p.m., the defendant went to the Sears Castaway Lounge in Waterbury, where he had several drinks. At the lounge, the defendant introduced himself to Mary-Jane Modeen, and the two talked and danced for several hours until the bar closed. At around 2 a.m. on Sunday, December 13, the defendant and Modeen left the bar together and drove in the defendant's truck to his apartment. They remained in the defendant's apartment for only a few minutes, however, because the defendant told Modeen that he had to go some place else. The defendant thereupon drove Modeen home.

After dropping Modeen off at her home at around 2:45 a.m., the defendant drove to the apartment complex in which his former wife and son resided. The defendant entered their apartment and proceeded to the upstairs bedroom where JoAnn Breton was sleeping. The defendant, wielding a sharp, five inch knife, proceeded to beat and stab her viciously. Struggling to escape from

---

[6] Section 53a-46b has been amended by Public Acts 1995, No. 95-16, § 3, effective April 12, 1995, and No. 95-19, § 3, effective October 1, 1995. Unless otherwise noted, all references will be to the revision to 1995. The revised death penalty statute, effective October 1, 1995; Public Acts 1995, No. 95-19, § 1; has no effect on the new sentencing hearing to be conducted in this case. See footnote 3.

the defendant's attack, JoAnn Breton managed to move across the room and away from the defendant. The defendant caught her, however, and continued his assault, inflicting multiple bruises, scrapes and knife wounds on her face, chest and neck. The defendant finally killed his former wife by thrusting the knife into and through her neck, transecting the carotid artery, a wound from which she bled to death.

Robert, Jr., was asleep in his bedroom when he was awakened by his mother's cries for help. At some point prior to his mother's death, Robert, Jr., entered her bedroom, where he, too, was attacked by the defendant. Although bleeding from a gash on his right forearm and severe cuts on his hands and fingers, Robert, Jr., escaped from the bedroom to a nearby landing area between the first and second floors, and then proceeded down the stairway to the first floor. The defendant pursued Robert, Jr., down the stairs, overtaking him at the bottom of the staircase. The defendant then resumed his attack on Robert, Jr., repeatedly stabbing him in the face, chest, shoulder and neck. Robert, Jr., as did his mother, bled to death from a knife wound that severed his carotid artery.

After the killings, the defendant left the apartment. Later that Sunday evening, he went to work at the Somers Thin Strip Company. On Monday morning, December 14, the defendant met a friend and coworker, Domenic Aurigemma and the two men drove to JoAnn Breton's apartment. The defendant went to the front door of the apartment while Aurigemma remained in the defendant's truck. The defendant quickly returned to his truck and told Aurigemma that the door to the apartment was locked and that the doorknob appeared to be stained with blood. After Aurigemma had also inspected the doorknob, the police were called. The police, with the assistance of the building superintendent, entered the apartment. There the police found the body of Robert, Jr., clad only in his underwear and covered with blood,

lying at the foot of the stairs leading to the second floor with his head propped up against the wall. They also found the body of JoAnn Breton, similarly clad and covered with blood, lying face up on the floor of the upstairs bedroom.

After the jury convicted the defendant of all counts, a separate sentencing hearing was held pursuant to § 53a-46a before the same jury that convicted the defendant. In that hearing, the trial court instructed the jury, without objection from the state, that its findings were to be based solely on the evidence adduced at the sentencing phase of the trial, and not on the evidence adduced at the guilt phase. The state claimed as an aggravating factor that the defendant had committed the murders of JoAnn Breton and Robert Breton, Jr., in an "especially cruel manner" within the meaning of § 53a-46a (h) (4).[7] The defendant claimed thirteen separate mitigating factors. See footnote 42. At the conclusion of the penalty hearing, which we will discuss as it

---

[7] See footnote 3. Prior to trial, the state filed an amended notice of aggravating factor alleging that the defendant had committed the offense in an "especially cruel manner" under § 53a-46a (h) (4). The trial court, upon motion of the defendant, dismissed the aggravating factor, holding that the term "especially cruel" was facially vague and overbroad in violation of the eighth and fourteenth amendments to the United States constitution. While the trial proceeded on the murder and capital felony charges, the state sought and received permission to file an expedited appeal to this court. See General Statutes § 52-265a. On appeal, we "put a judicial gloss upon the term 'especially cruel' that adopts a definition that saves this term from its facial vagueness and yet construes it as narrowly as possible in the defendant's favor." State v. Breton, 212 Conn. 258, 269–70, 562 A.2d 1060 (1989). Accordingly, we concluded that the state, in order to prove the existence of an aggravating factor under § 53a-46a (h) (4), would be required to establish that the defendant "intentionally inflicted extreme pain or torture upon the victim, above and beyond the pain necessarily accompanying the victim's death." Id., 271. Because the jury had convicted the defendant of all counts during the pendency of the expedited appeal, we remanded the case to the trial court to proceed with the sentencing hearing in accordance with our definition of the term "especially cruel." The defendant now appeals from the judgment of the trial court imposing the death penalty following that hearing.

becomes relevant, the jury returned a special verdict pursuant to § 53a-46a (e) reporting its finding of an aggravating factor and no mitigating factor. The trial court thereafter rendered judgment imposing the death penalty on the defendant in accordance with the jury's verdict on the capital felony count.[8]

On appeal, the defendant does not challenge the sufficiency of the evidence underlying his convictions.[9] He raises numerous claims, however, contesting the validity of the death sentence imposed. The defendant first claims that our death penalty scheme violates the federal and state constitutions. He also contends that the trial court improperly: (1) refused to set aside the jury's finding that the state had proved the existence of an aggravating factor beyond a reasonable doubt; and (2) refused to set aside the jury's finding that the defendant had not established one or more mitigating factors by a preponderance of the evidence. He further maintains that the trial court's jury instructions were incorrect because the court improperly: (1) failed to require a unanimous verdict on the mitigating factors; (2) failed to apprise the jury that its findings on the aggravating and mitigating factors would determine whether the defendant would receive the death penalty; (3) rejected the defendant's request for an instruction that extreme

[8] The trial court rendered no judgment with respect to the two murder counts "because the double jeopardy clause of the fifth amendment to the United States constitution forbids punishment for both a capital felony and the murder that constitutes a lesser included offense. *State* v. *Wood*, 208 Conn. 125, 145, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988); *State* v. *Usry*, 205 Conn. 298, 318, 533 A.2d 212 (1987)." *State* v. *Roseboro*, 221 Conn. 430, 433 n.3, 604 A.2d 1286 (1992).

[9] The defendant initially claimed that the trial court improperly had refused to instruct the jury that if it was unable to agree unanimously on the charge of murder, then it could consider whether the defendant was guilty of the lesser included offense of manslaughter in the first degree. In his supplemental brief and at oral argument, however, the defendant acknowledged that this claim was foreclosed by our holding in *State* v. *Sawyer*, 227 Conn. 566, 630 A.2d 1064 (1993), which we today reaffirm.

emotional disturbance constituted a statutory mitigating factor; (4) refused to instruct the jury on each of the nonstatutory mitigating factors argued by the defendant and refused to submit a list of those mitigating factors to the jury; and (5) instructed the jury on the definition of mitigating factors.[10] Finally, the defendant challenges the trial court's evidentiary ruling permitting the jury to consider testimony presented by the defendant in mitigation of the death penalty as evidence of an aggravating factor.[11]

We conclude both that the state's evidence was sufficient to sustain the jury's finding of an aggravating factor and that the jury reasonably could have rejected all the mitigating factors claimed by the defendant. We also conclude, however, that the jury's finding of "no mitigating factor" cannot stand because, as a result of certain ambiguities in the special verdict form and in the trial court's jury instructions, the record does not demonstrate definitively that the jury's verdict rejecting mitigating factors was unanimous. The defendant, therefore, is entitled to a new sentencing hearing.

---

[10] The defendant also contended, in his original appeal brief, that the trial court failed to charge the jury at the penalty phase on the two witness rule under General Statutes § 54-83, which provides that "[n]o person may be convicted of any crime punishable by death without the testimony of at least two witnesses, or that which is equivalent thereto." As the defendant acknowledges, however, we considered and rejected an identical claim in *State* v. *Ross*, 230 Conn. 183, 278–79, 646 A.2d 1318 (1994), cert. denied, U.S. , 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), concluding that "§ 54-83 applies only to the guilt phase and not to the penalty phase of a capital felony trial." Id., 278. We reject the defendant's claim for the same reason.

[11] The defendant raises three additional claims which, he contends, require reversal of the judgment with respect to the imposition of the death penalty. First, he invokes our review under § 53a-46b (b); see footnote 5; claiming that his death sentence is excessive and disproportionate to the penalty imposed in similar cases. He next contends that the trial court, in order to avoid a lengthy postponement of the jury deliberations, placed undue pressure on the jury to return a verdict after one day of deliberations. Finally, the defendant maintains that the prosecutor made several improper comments during his closing argument to the jury. We do not reach these claims in light of our remand for a new sentencing hearing.

# I
## CONSTITUTIONALITY OF THE DEATH PENALTY STATUTE

The defendant challenges the facial validity of the provisions of our death penalty statutes.[12] Specifically, he claims that the capital sentencing scheme is unconstitutional under both the federal and the state constitutions because it: (1) allows the state to establish an impermissibly vague aggravating factor, namely, that the defendant committed the offense in an "especially cruel manner"; (2) fails to provide for a capital sentencer empowered to make an individualized, moral determination as to the appropriateness of death; and (3) calls for an internal balancing of mitigants against aggravants that is unreviewable, or standardless and arbitrary. He further claims that our sentencing scheme violates the state constitution because the scheme: (1) constitutes cruel and unusual punishment impliedly prohibited by article first, §§ 8 and 9;[13] (2) mandates the imposition of the death penalty by impermissibly limiting the jury's opportunity to reject the death penalty; (3) requires the defendant to prove the existence of a mitigating factor by a preponderance of the evidence; and (4) embodies a presumption that death is the appropriate penalty.

Although the defendant acknowledges that we have already considered and rejected each of these constitutional claims in *State* v. *Ross*, 230 Conn. 183, 646 A.2d 1318 (1994), cert. denied,    U.S.   , 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), he nonetheless asks us to reexamine and reconsider the conclusions reached

---

[12] The defendant also argues that our death penalty statutes are unconstitutional as applied to him. We address those claims, to the extent that they have been properly raised, in parts II, III and IV of this opinion.

[13] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

therein. Upon review of the merits of the defendant's claims, we are persuaded that our constitutional holdings in *Ross* should be affirmed. Accordingly, for the reasons stated in *Ross*, we reject the defendant's challenges to our capital sentencing scheme that he makes under both the federal and the state constitutions because: (1) the judicial gloss that we placed upon the term "especially cruel" in *State* v. *Breton*, 212 Conn. 258, 270–71, 562 A.2d 1060 (1989); see footnote 7; saves that aggravating factor from constitutional infirmity; *State* v. *Ross*, supra, 255–56; (2) our death penalty scheme "provides the capital sentencer with sufficient latitude to make a reasoned moral and individualized determination, based on the defendant's background, character and crime, that death is the appropriate punishment"; id., 253; and (3) § 53a-46a (d) does not render the capital sentencer's findings on mitigating factors unreviewable, or standardless and arbitrary. Id., 281–84. We further conclude, also for the reasons enumerated in *Ross*, that our death penalty statutes that the defendant challenges under only the Connecticut constitution pass muster because: (1) the death penalty is not per se prohibited by article first, §§ 8 and 9, of the state constitution; id., 249–52; (2) the scheme, by "giv[ing] the capital sentencer . . . the proper amount of guided discretion to make the appropriate determination regarding the individual defendant with regard to the defendant's specific crime," is not impermissibly mandatory; id., 241; (3) there is no constitutional prohibition against requiring a capital defendant to bear the burden of establishing a mitigating factor if the state has proved an aggravating factor; id., 254–55; and (4) assigning to the defendant the burden of proving a mitigating factor does not create a statutory presumption in favor of the death penalty. Id.

## II

### SUFFICIENCY OF THE EVIDENCE

Under our capital sentencing scheme, a capital defendant may not be sentenced to death unless the

state establishes the existence of an aggravating factor beyond a reasonable doubt and the defendant fails to establish a mitigating factor by a preponderance of the evidence. General Statutes § 53a-46a (f).[14] The jury found as an aggravating factor that the defendant had committed the offense in an "especially cruel manner." General Statutes § 53a-46a (h) (4). The jury's verdict also indicated that it had found no mitigating factor. The defendant claims that the evidence adduced at trial did not support the jury's finding of an aggravating factor and, further, that the jury reasonably could not have rejected one or more of the claimed mitigating factors. If we were to agree with either of these claims, principles of double jeopardy would require us to reverse the judgment imposing the death penalty and remand the case to the trial court with direction to impose on the defendant a sentence of life imprisonment without the possibility of release. See *State* v. *Ross*, supra, 230 Conn. 258; *State* v. *Daniels*, 207 Conn. 374, 397–99, 542 A.2d 306 (1988). Because we are not persuaded by either claim, however, we conclude that the defendant is not entitled to a judgment directing the imposition of a sentence of life imprisonment.

A

The state charged that the defendant had committed the offense of capital felony in an "especially cruel manner" in violation of § 53a-46a (h) (4). In a prior appeal concerning this case, we have previously concluded; see footnote 7; that the term "especially cruel" means the "intentional infliction of extreme pain or torture above and beyond that necessarily accompanying the underlying killing." *State* v. *Breton*, supra, 212 Conn. 270. In *State* v. *Ross*, supra, 230 Conn. 260–61,

[14] Number 95-19 of the 1995 Public Acts provides for the weighing of aggravating and mitigating factors by the fact finder. As we have previously indicated, however; see footnote 6; the changes to our death penalty scheme effected by that public act have no bearing on our adjudication of this appeal.

we concluded that "extreme pain" encompasses not only physical pain, but also psychological pain. At the penalty phase hearing in this case, however, which was conducted nearly five years prior to our decision in *Ross*, the trial court, at the defendant's request and without objection from the state, instructed the jury as follows: "The pain required to be proved by the state is extreme physical pain. The mental pain or the stress of the victims is not a consideration in this aggravating factor and you must remove it from your minds. The only pain you may consider is physical pain." Our review of the defendant's claim is limited, therefore, to a determination of whether the jury reasonably could have found that the defendant intentionally inflicted extreme *physical* pain on his victims,[15] above and beyond that necessarily accompanying the underlying killings.[16]

---

[15] The trial court further instructed the jury that the state was required to prove that the defendant had killed *both* JoAnn Breton and Robert Breton, Jr., in an especially cruel manner. The state claims that although the evidence supported the jury's finding that each of the two murders was especially cruel, § 53a-46a (h) (4) requires the state to prove only that *one* of the two victims had been killed in such a manner. Under this view, we could resolve the defendant's claim of evidentiary insufficiency in favor of the state if we were to determine that the evidence supported a finding that the defendant had killed one, but not both, of the victims in an especially cruel manner. Because we conclude that the state adduced sufficient evidence to support the jury's finding that the defendant killed both victims in an especially cruel manner, we need not decide this issue.

[16] The defendant claims that we are precluded from considering, in our determination of the defendant's claim that the state failed to establish that the killings were especially cruel, any of the evidence presented by the defendant in support of the mitigating factors. In particular, the defendant contends that we may not consider the testimony of the psychiatrist retained by the defendant, Walter Borden, enumerating the defendant's detailed statement to him describing the two murders, which testimony the state claims tended to establish that the defendant committed the offense in an especially cruel manner. See part IV of this opinion. We need not reach this issue, however, because we conclude that the testimony of the state's witnesses was sufficient to prove beyond a reasonable doubt that the defendant committed the offense in an especially cruel manner. See *State* v. *Medina*, 228 Conn. 281, 302–303 n.28, 636 A.2d 351 (1994).

In reviewing a claim under § 53a-46b (b) (2) that "the evidence fail[ed] to support the finding of an aggravating factor specified in subsection (h) of section 53a-46a," we will subject that finding "to the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding, such as the voluntariness of a confession; *State* v. *Medina*, 228 Conn. 281, 294, 636 A.2d 351 (1994); *State* v. *Smith*, 200 Conn. 465, 478, 512 A.2d 189 (1986); or the seizure of a defendant. *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993); *State* v. *Northrop*, 213 Conn. 405, 414, 568 A.2d 439 (1990)." *State* v. *Ross*, supra, 230 Conn. 259. However, "[e]ven with the heightened appellate scrutiny appropriate for a death penalty case, the defendant's challenge to the sufficiency of the evidence of aggravating circumstances must be reviewed, in the final analysis, by considering the evidence presented at the defendant's penalty hearing in the light most favorable to sustaining the facts impliedly found by the jury." Id., 264. Furthermore, "[i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with [the existence of the aggravating factor] and is not required to draw only those inferences consistent with [its nonexistence]. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Francis*, 228 Conn. 118, 127, 635 A.2d 762 (1993); see also *State* v. *Sivri*, 231 Conn. 115, 132–33, 646 A.2d 169 (1994).

In support of its claim that the defendant had killed JoAnn Breton and Robert Breton, Jr., in an especially cruel manner, the state presented the testimony of Arkady Katsnelson, the state's chief medical examiner, and Henry Lee, the state's chief criminalist and director of the state forensic laboratory. The state relied on

Katsnelson, who performed autopsies on both of the victims, to establish the nature and severity of the injuries sustained by the victims, and on Lee, through his reconstruction of the crime scene,[17] to establish the sequence of events that resulted in the deaths of the two victims in the early morning hours of December 13, 1987.

In light of the testimony of Lee and Katsnelson, the jury reasonably could have found the following facts to support the state's claim that the defendant had killed his former wife in an especially cruel manner. The state adduced three persuasive sets of facts.

First, JoAnn Breton had been severely beaten before her death. The autopsy revealed multiple blunt force trauma wounds on her right cheek, left and right eyes, left forehead, nose, left and right side of the mouth, upper and lower lips, chin, right elbow and knee. The autopsy also indicated that she had suffered abrasions on her left cheek, right eye and right forehead. In addition, there was evidence of bleeding in the victim's nose and mouth. According to Katsnelson, each of the victim's wounds and abrasions had been caused by a separate blow and had been inflicted before she died.

Second, JoAnn Breton had been stabbed several times with a long, sharp instrument. Specifically, the autopsy revealed a stab wound to the left breast, which did not penetrate the chest cavity, and two stab wounds to the neck. Katsnelson testified that the second of the two neck wounds was the final and fatal injury, and that it had been inflicted by a sharp instrument that

---

[17] Lee testified that he had been able to reconstruct the crime scene by examining photographs of the scene, police and autopsy reports, and certain physical evidence that had been removed from the victims' home, including floor tiles, wall sections and blood samples. Lee also relied on blood splatters that were found throughout the home, the size and patterns of which aided him in determining the manner and sequence in which the killings had been committed.

entered her throat and exited the back of her neck, severing her carotid artery.[18] According to Katsnelson, JoAnn Breton bled to death from that wound.

Third, the jury could have found that JoAnn Breton was awake and conscious throughout the assault, and that she had struggled with her assailant in an effort to ward off the attack. Lee testified that blood splatter evidence indicated that she had been standing sometime after the first wound was inflicted, and that blood smears on the telephone receiver on the night table located at the head of the bed and blood splatters on the floor beside the bed indicated that during the assault, she had moved from the head of the bed to the foot of the bed and from one side of the bed to the other. Furthermore, blood stains on the mattress and box spring and blood splatters on and around a fan on the bedroom floor led Lee to conclude that she had managed to move from one side of the room to the other in an unsuccessful effort to escape from her assailant. Finally, Lee testified that the large amount of dried blood on JoAnn Breton's body and on the floor near her head indicated that she lay alive on the floor of the bedroom for some period of time after the assault, before expiring from loss of blood.

From this evidence, the jury reasonably could have concluded that the murder of JoAnn Breton involved the intentional infliction of extreme physical pain above and beyond that necessary to accomplish the underlying killing. "Intent involves a mental process which ordinarily can be proven only by circumstantial evidence. . . . Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one." (Citation omitted; internal quotation marks omitted.) *State* v. *Medina*, supra, 228

---

[18] The carotid artery is a main artery that runs through the neck and supplies blood from the aorta to the brain.

Conn. 303. Just as intent to kill "may be inferred from evidence of the defendant's use of a deadly weapon, the manner in which the weapon was used, and the nature and number of wounds inflicted"; *State* v. *Patterson*, 229 Conn. 328, 333, 641 A.2d 123 (1994); *State* v. *Rasmussen*, 225 Conn. 55, 74, 621 A.2d 728 (1993); so may the state rely on the number and severity of the wounds inflicted on JoAnn Breton and the defendant's repeated use of blows and a deadly weapon to establish that the defendant intended to inflict extreme physical pain on her. This evidence, along with the testimony that she was awake during the attack and lay conscious for a period of time after absorbing the beatings and stabbings, also supports the conclusion that she did, in fact, suffer extreme physical pain. We are persuaded, therefore, that the state's evidence sufficed as a matter of law to establish that JoAnn Breton suffered an especially cruel death at the hands of the defendant.

The state presented the following evidence tending to prove that the defendant had also killed his son in an especially cruel manner. That evidence, too, had multiple parts.

First, Robert, Jr., had been repeatedly stabbed before he died. The autopsy performed on Robert, Jr., revealed stab wounds to the left cheek, throat, neck, chest, back left shoulder, right arm and elbow, chin and the palm and four fingers of his right hand. Several of the stab wounds were especially severe, including a gash that had ripped the skin from his forearm and a wound to the back that measured nearly one foot in length. According to Katsnelson, Robert, Jr., like his mother, died from a stab wound to the neck that severed his carotid artery. Katsnelson opined that all of the other stab wounds were inflicted prior to Robert, Jr.'s death.

Second, according to Lee's analysis of the location and form of various blood spatters, Robert, Jr., was in

his mother's bedroom when he was first stabbed by the defendant on his right arm and hand. He then fled, bleeding, from the hallway to the staircase and down the stairs, where he was overtaken by the defendant and received the stab wound to his neck that severed his carotid artery. Other blood stains indicated that the victim fell against the wall several times, and that, after being stabbed in the throat and the neck, Robert, Jr., had fallen backwards on to the stairs, where he bled to death.

From this evidence about the nature and severity of the wounds and the circumstances in which they were inflicted, the jury reasonably could have found that the defendant also intentionally killed Robert, Jr., in an especially cruel manner. The jury further could have found that the multiple stab wounds inflicted by the defendant prior to the infliction of the fatal wound that severed Robert, Jr.'s carotid artery had caused him great pain above and beyond that necessarily accompanying the killing. Thus, we conclude that the state's evidence reasonably supported the jury's finding that the defendant had killed Robert, Jr., in a way that was especially cruel.

## B

The defendant also claims that the evidence he presented in mitigation of the death penalty, though contested by the state, was so compelling that the jury could not reasonably have concluded that the defendant had failed to prove one or more of the mitigating factors by a preponderance of the evidence. In response, the state first maintains that we are statutorily prohibited from reviewing the jury's findings on mitigating factors. The state further contends that even if we are not barred from deciding the merits of the defendant's claim, the claim must fail because the jury reasonably could have found that the defendant failed to meet his burden of

proving the existence of a mitigating factor by a preponderance of the evidence.[19] Although we reject the state's contention that the defendant is not entitled to review of his claim, we agree with the state that, in light of the evidence presented in mitigation, the jury was not bound to find the existence of a mitigating factor.

The state's first argument rests upon the language of § 53a-46b (b) (2); see footnote 5; which expressly authorizes this court to determine whether the evidence adduced at trial was sufficient to support the jury's finding of an aggravating factor. The state maintains that the absence of an express correlative statutory provision authorizing a similar review of the evidence of mitigating factors reflects a legislative intent to preclude appellate review on that issue.

It is a basic tenet of statutory construction that the intent of the legislature is to be found not in an isolated phrase or sentence but, rather, from the statutory scheme as a whole. *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, 226 Conn. 792, 808, 629 A.2d 367 (1993); *Groton* v. *Yankee Gas Services Co.*, 224 Conn. 675, 689, 620 A.2d 771 (1993). Furthermore, in reviewing the statutory language, we "will assume that the legislature intended to accomplish a reasonable and rational result." (Internal quotation marks omitted.) *Summit Hydropower Partnership* v. *Commissioner of Environmental Protection*, supra, 808. Although we acknowledge that § 53a-46b makes explicit reference only to our review of the evidence on aggravating factors, we are persuaded that this language, when read in the broader statutory context, does not preclude our review of the evidence presented in mitigation. In fact, a contrary conclusion is

---

[19] The trial court rejected the defendant's claim that he had proved the existence of a mitigating factor as a matter of law and, accordingly, refused to disturb the jury's findings on mitigating factors.

compelled by subsection (a) of § 53a-46b, which provides in relevant part: "Any sentence of death imposed . . . shall be reviewed by the supreme court pursuant to its rules. *In addition to its authority to correct errors at trial*, the supreme court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a."[20] (Emphasis added.) Indeed, in *State* v. *Daniels*, supra, 207 Conn. 396, we concluded that the trial court had the authority to render a judgment "acquitting" the defendant of the death penalty "[i]f, on the basis of the evidence adduced at the entire hearing, the jury could not reasonably fail to find that a mitigating factor exists . . . ." Thus, § 53a-46b (a) confers upon this court the obligation to review any death sentence, and the scope of that review necessarily includes the authority to correct errors at trial. Thus, the statute authorizes us to determine whether the trial court correctly denied the defendant's motion for a judgment "acquitting" the defendant of the death penalty on the ground that the evidence presented in mitigation required the jury to find the existence of a mitigating factor.

Moreover, if we were to construe § 53a-46b (b) as urged by the state, we would lack statutory authorization to consider, for example, whether any other claimed evidentiary or instructional errors warranted a reversal of the imposition of the death penalty. Under this view of the statute, our ability to review a death sentence would be extremely limited. Indeed, the state's construction would be inconsistent with the review we

---

[20] General Statutes § 53a-35a provides in pertinent part: "Imprisonment for any felony committed on or after July 1, 1981; Definite sentences; Terms authorized. For any felony committed on or after July 1, 1981, the sentence of imprisonment shall be a definite sentence and the term shall be fixed by the court as follows: (1) For a capital felony, a term of life imprisonment without the possibility of release unless a sentence of death is imposed in accordance with section 53a-46a . . . ."

conducted in *State* v. *Ross*, supra, 230 Conn. 183, wherein we concluded that the defendant was entitled to a new penalty phase hearing due to the trial court's improper exclusion of certain evidence proffered by the defendant in mitigation of the death penalty. Id., 272–73. The state points to nothing in the legislative history of our death penalty statutes, and we have found nothing to support its claim that the legislature intended to restrict so drastically a capital defendant's right to appellate review of such a profoundly important element of the death penalty.

Finally, our conclusion is consistent with the eighth amendment's requirement that "death penalty statutes [must] be structured so that the death penalty is imposed in a consistent and reliable manner." Id., 231. The opportunity for meaningful appellate review helps to ensure that the death penalty will not be imposed arbitrarily or capriciously. We conclude that the defendant's right to appellate review of the death sentence includes his right to appellate consideration of his claim that the evidence established the existence of a mitigating factor as a matter of law.

Before turning to the evidence that the defendant claims required a finding of a mitigating factor, we first consider the issue of the applicable standard of review. The defendant urges us to conduct a de novo review of the evidence to determine whether, in our independent judgment, the death penalty should be imposed in light of the mitigating evidence. The state, on the other hand, argues that we may not disturb the jury's findings on mitigating factors unless it appears that the jury incorrectly applied the law to the facts or that its verdict was the product of prejudice or corruption. We do not agree with either party. In ascertaining the appropriate standard by which to review the finding of an aggravating factor in *State* v. *Ross*, supra, 230 Conn. 259, we concluded that "[§] 53a-46b (b) (2) requires only a determination of whether 'the evidence fails to support

the finding of an aggravating factor . . . .' [B]ecause of the seriousness of any death penalty determination, we will [employ] . . . the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding . . . ." We see no reason why we should not apply the same standard of review to a finding of no mitigating factor. Although our review of the evidence in mitigation of the death penalty is a heightened one, however, we will not substitute our judgment or opinions for that of a reasonable jury. *State* v. *Mejia*, 233 Conn. 215, 224, 658 A.2d 521 (1995); *State* v. *Hart*, 198 Conn. 424, 427, 503 A.2d 588 (1986). Instead, we must determine whether the defendant's proof of a mitigating factor was so clear and so compelling that the jury, in the exercise of reasoned judgment, could not have rejected it. Under our death penalty statute, the defendant must convince the jury not only of the facts underlying an alleged nonstatutory mitigating factor, but also that the factor "is mitigating in nature, considering all the facts and circumstances of the case," such that "in fairness and mercy, [it] may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death." General Statutes § 53a-46a (d).

The defendant maintains that the evidence, as a matter of law, established the existence of a statutory mitigating factor and the existence of several nonstatutory mitigants. As to the statutory mitigating factor, the defendant claims to have proved that "his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of the law was significantly impaired but not so impaired in either case so as to constitute a defense to the prosecution."[21] General Statutes § 53a-46a (g) (2). The defendant also claims

[21] It bears mention that the defendant made no claim of insanity or extreme emotional disturbance at the guilt phase of his trial.

that his evidence in mitigation similarly established that he should be spared the death penalty for one or more of the following nonstatutory reasons: (1) he was suffering from a mental impairment at the time he committed the murders;[22] (2) he was suffering from extreme emotional disturbance when he committed the murders; (3) he had demonstrated good behavior in prison and the ability to lead a productive, nonviolent life in prison; (4) he had worked steadily and productively prior to the commission of the offense; (5) he was the product of a disturbed family background; (6) mercy; and (7) any combination of the aforementioned factors.

The defendant relied primarily on the testimony of two expert witnesses, as well as family members, coworkers, a friend and correction department employees, to establish the factors he adduced in mitigation of the death penalty. Anne Phillips, a clinical psychologist retained by the defendant, administered a battery of psychological tests to the defendant after his arrest and incarceration. She diagnosed the defendant as suffering from a severe mixed personality disorder with schizoid, paranoid and depressive features, an illness whose origins, in all likelihood, were rooted in the defendant's adolescence. In Phillips' opinion, the defendant's chronic and severe mental illness had a pervasive and debilitating effect on his everyday functioning. Moreover, it was likely, although not scientifically certain, that the defendant's mental capacity was significantly impaired at the time of the offense.

Walter Borden, a psychiatrist also retained by the defendant, testified that the defendant suffered from a severe mixed personality disorder with borderline schizoid, paranoid and depressive trends. On the basis of his examination of the defendant while the defendant

---

[22] The defendant's nonstatutory claim of mental impairment is to be distinguished from his statutory claim of mental impairment in that the latter, but not the former, requires proof that the impairment was "significant."

was incarcerated awaiting trial, Borden concluded that at the time of the murders, the defendant's mental capacity and his ability to conform his conduct to the requirements of the law were significantly impaired. In Borden's opinion, the defendant was also suffering from extreme emotional disturbance when he committed the offense. Borden further opined that the defendant was an irrationally jealous husband who remained possessive of his former wife even after their divorce, that he drank too much and abused prescription drugs, and that he was impulsive and unable to deal with his emotions.[23]

The defendant called several lay witnesses to testify about his troubled upbringing, his good work record prior to the murders, and his exemplary behavior in prison. Cathy Bunker, the defendant's sister, and Ruth Breton, his aunt, testified that: the defendant's mother had placed him in an orphanage when he was a little more than one year old, and when he returned to the family home at age four, he appeared to have "been terribly abused" and was frightened and withdrawn; his parents, who separated when he was nine years old, were alcoholics who openly engaged in deviant sexual behavior in their home; his mother punished him by whipping him with a belt; his mother once killed a pet cat and carved it into pieces; and his father was preoccupied with knives and killing, and had threatened to kill the defendant. Robert Trumfio, the personnel

---

[23] Borden also testified that the defendant had previously pleaded guilty to manslaughter for the fatal stabbing of his father in 1966, a crime for which he had received a suspended sentence and a period of probation. According to the information provided by the defendant to Borden, the defendant had killed his father in self-defense after his father, angry and intoxicated, had attacked the defendant in the kitchen of their home. The trial court, in its charge to the jury at the completion of the penalty phase evidence, instructed the jury that it could not consider the defendant's prior manslaughter conviction in its determination of the aggravating factor alleged by the state. The trial court further instructed the jury, in response to an inquiry from the jury after it had commenced its deliberations, that it was entirely free to consider the evidence in mitigation of the death penalty.

administrator at the Somers Thin Strip Company in Waterbury, the defendant's employer, testified that the defendant had been a productive employee for the nineteen years preceding his arrest. Domenic Aurigemma, the defendant's friend and coworker, corroborated Trumfio's testimony. Finally, Edward Zelek and Christopher Pelkey, employees at the Cheshire correctional center, testified that the defendant was well behaved and caused no trouble for correction personnel or other inmates.

In addition, the defendant argued to the jury that he should be spared the death penalty on grounds of mercy. To support this claim, the defendant offered, in addition to the other evidence in mitigation, Borden's opinion that the defendant did not intend to harm the victims or cause them extreme pain,[24] and that the defendant had expressed remorse for the killings.[25]

The state relied solely on its cross-examination of the defendant's witnesses to rebut the defendant's mitigating evidence. Phillips acknowledged that the interpretation and evaluation of the tests administered to the defendant required the exercise of her subjective judgment. In addition, she testified that her conversations with the defendant had lasted altogether only forty-five minutes and that, in reaching her diagnosis, she had not considered how the defendant's circumstances at the time of the testing, as distinguished from his circumstances prior to the commission of the mur-

---

[24] This testimony, if credited, would also have required the jury to reject the aggravating factor that the defendant had committed the offense in an especially cruel manner.

[25] During one of his interviews with Borden, the defendant described, in detail, what had transpired on the night of the murders. On direct examination, Borden read from his notes of the interview, which included the following statements by the defendant: "God, no, no, no, I didn't do that, I couldn't do it. No, no, no . . . . [W]hy do I remember so much? Why have to remember. . . . Why, why, why." The defendant maintains that these statements constitute persuasive evidence of his remorse for the killings.

ders, might have affected his psychological condition. On this point, Phillips acknowledged that, at the time of testing, the defendant's psychological state may have been colored by feelings of shame or guilt for the murders, the likelihood of a lengthy incarceration, and the prospect of a death sentence. Phillips also admitted that although her test results indicated that the defendant was significantly impaired at the time the tests were administered, she could not state with certainty whether he suffered from the same mental impairment at the time he committed the offense.

Borden testified on cross-examination that his diagnosis was based on four interviews with the defendant, conducted over a period of eight hours, interviews with Ruth Breton and Cathy Bunker, a telephone interview with the defendant's former girlfriend, and the results of the tests administered to the defendant by Phillips. Borden acknowledged that all of the information pertaining to the defendant's family background had been submitted by Ruth Breton and Cathy Bunker, and not by the defendant. Borden also stated that, when he made his diagnosis, he had not known that the defendant had broken into and ransacked his former wife's home within one year preceding the murders, and that, in a separate incident, the defendant had threatened to kill her.[26]

On cross-examination by the state, neither Cathy Bunker nor Ruth Breton was able to confirm that the defendant had ever witnessed any of the incidents of deviant sexual behavior in the Breton household to which they had testified on direct examination. Similarly, neither of the two witnesses could say whether the defendant had seen his mother kill the family's pet cat. Both witnesses also acknowledged that the defendant was often the child favored by his mother.

---

[26] On redirect examination, Borden testified that his diagnosis would not have changed even if he had been aware of these additional facts regarding the defendant's background.

The defendant contends that no reasonable jury could have rejected all of his claimed mitigating factors. Although it is true that the state did not offer any evidence of its own, that alone is not a reason to overturn the jury's finding. As we have recently stated in this very context, "the state can weaken the force of the defendant's presentation by cross-examination and by pointing to inconsistencies in the evidence." *State* v. *Ross*, supra, 230 Conn. 265–66. Furthermore, the general rule that a jury is free either to accept or reject, in whole or in part, the evidence presented by the defendant's witnesses; see, e.g., *State* v. *Medina*, supra, 228 Conn. 310; *State* v. *Steiger*, 218 Conn. 349, 590 A.2d 408 (1991); *State* v. *Perez*, 182 Conn. 603, 438 A.2d 1149 (1981); has particular applicability where, as here, the state has vigorously contested the force of that testimony by cross-examination. Thus, the credibility of the defendant's expert and lay witnesses, and the weight to be given to their testimony regarding the existence of mitigating factors, is a matter committed to the sound judgment and common sense of the trier of fact.

In this case, the testimony elicited by the state on cross-examination of the lay witnesses raised questions as to whether the alleged nonstatutory mitigating factors, even if factually true, were sufficient "to extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death." General Statutes § 53a-46a (d); see *State* v. *Ross*, supra, 230 Conn. 265–66. In addition, the jury reasonably could have concluded that the professional opinions of the defendant's experts, because those opinions were necessarily the product of a subjective judgment, did not suffice to establish that the defendant's mental condition on the morning of the murders was so "significantly impaired" as to warrant a finding for the defendant under the statutory mitigating factor contained in § 53a-46a (d).

In light of our careful review of the record, we are persuaded that the defendant's evidence left room for the jury to find that the defendant had failed to satisfy his burden of persuasion on the statutory and nonstatutory mitigating factors.

## III

## JURY INSTRUCTIONS

The defendant also maintains that his death sentence must be set aside because the trial court improperly instructed the jury during the penalty phase of the trial. He contends that the trial court improperly: (1) failed to require a unanimous jury verdict on the mitigating factors; (2) failed to inform the jury that its verdict on the aggravating and mitigating factors would determine whether the defendant would be sentenced to death; (3) refused to instruct the jury that extreme emotional disturbance is a statutory, rather than a nonstatutory, mitigating factor; (4) declined to instruct the jury on each of the defendant's alleged mitigating factors and refused to submit to the jury a written list of those factors; and (5) instructed the jury on the definition of mitigating factors. We agree with the defendant that due to ambiguities both in the special verdict form and in the jury charge, the record fails to demonstrate that the jury's finding of "no mitigating factor" was the product of a unanimous vote. Accordingly, we reverse the judgment with respect to the imposition of the death penalty and remand for a new sentencing hearing. We will address the defendant's remaining claims of instructional error only insofar as they are likely to arise at the new penalty hearing.[27]

## A

The defendant claims that the trial court improperly failed to require a unanimous jury verdict on the mitigat-

---

[27] Although we need not resolve the defendant's other claims of instructional error, we note generally that the trial court took commendable care in instructing the jury on the complexities of our death penalty statute.

ing factors. Specifically, he contends that the trial court's jury charge and the language of the special verdict form submitted to the jury pursuant to § 53a-46a (e)[28] deprived him of his right to jury unanimity on the mitigating factors under *State* v. *Daniels*, supra, 207 Conn. 374. We agree.[29]

In *Daniels*, we concluded that "the imposition of the death penalty under § 53a-46a (e) must be premised on two unanimous findings by the trier of fact: that the state has proved beyond a reasonable doubt that an aggravating factor exists and that the defendant has not proved by a preponderance of the evidence that a mitigating factor exists." Id., 394. Thus, the death penalty cannot be imposed under § 53a-46a (e) unless each and every juror finds that the defendant failed to prove the existence of each and every mitigating factor by a preponderance of the evidence. See *State* v. *Ross*, supra, 230 Conn. 243–44. If one or more of the jurors believe that the defendant has proven a mitigating factor but the other jurors disagree, a hung jury results. As we stated in *Daniels*, "[f]aced with a jury that is unable to agree unanimously on its findings [under § 53a-46a (e)], the trial court may, in the exercise of its discretion, grant a motion for mistrial by either party" or "enter a judgment 'acquitting' the defendant of the death penalty." *State* v. *Daniels*, supra, 207 Conn. 394, 396; see also *State* v. *Ross*, supra, 244.

---

[28] Section 53a-46a (e) provides that "[t]he jury . . . shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor."

[29] The defendant also contends that he was deprived of his eighth amendment right to the full and fair consideration of the mitigating evidence because the "no mitigating factor" responses on the special verdict form allowed the jury to report that it had not found the mitigating factors even though its votes on those factors were not unanimous. See *Mills* v. *Maryland*, 486 U.S. 367, 375–76, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988); *Eddings* v. *Oklahoma*, 455 U.S. 104, 110, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982). We need not consider this claim because we conclude that the error in the verdict form, together with the jury charge, violated the unanimity requirement prescribed by *Daniels*

The defendant's argument regarding lack of unanimity rests principally upon the alleged ambiguity of the special verdict form and the instructions of the trial court concerning the jury's completion of the form. The special verdict form, as completed by the jury, provides in part:

*"Special Verdict Form*

*Mitigating factors*

1. Has the defendant, Robert J. Breton, Sr., proved by a preponderance of the evidence that his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution?

\_\_\_ *Yes*, we the jury unanimously agree that the Defendant has proved this mitigating factor by a preponderance of the evidence.

\* \* \*

_X_ *No*, we the jury do not unanimously agree that the Defendant proved this mitigating factor by a preponderance of the evidence.

\* \* \*

2. Has the Defendant, Robert J. Breton, Sr., proved by a preponderance of the evidence any other mitigating factor concerning his character, background and history or the nature and circumstances of the crime?

\_\_\_ *Yes*, we the jury unanimously agree that the Defendant has proved such a mitigating factor by a preponderance of the evidence.

\* \* \*

_X_ *No*, we the jury do not unanimously agree that the defendant proved such a mitigating factor by a preponderance of the evidence."

The jury was instructed to render its verdict by placing an "X" on the appropriate line, and the jurors were told

to sign their names under that answer in the space provided. At the conclusion of its deliberations, the jury returned the special verdict form as indicated above, followed by the jurors' signatures. Construing the jury's two "No" responses, the trial court concluded that the jury had unanimously rejected the defendant's statutory and nonstatutory mitigating factors. Because the jury also had found that the state had proved the existence of an aggravating factor beyond a reasonable doubt, the trial court imposed on the defendant a sentence of death pursuant to subsections (f) and (h) of § 53a-46a.

The defendant contends that the statement "No, we the jury do not unanimously agree that the defendant proved [the] mitigating factor" is flawed for two closely related reasons. First, the defendant claims it is impossible to determine from that response whether the jury had unanimously rejected the mitigating factors or whether the jury merely was unable to *agree* that the defendant had proved a mitigating factor. Second, the defendant asserts, the statement conveyed to the jury the false impression that it could render a verdict of "no mitigating factor" without having unanimously rejected each of the alleged mitigating factors.[30] The defendant is correct on both accounts.

The literal meaning of the response "we the jury do not unanimously agree that the defendant proved [the] mitigating factor" is plain: the jury was *unable to reach unanimous agreement* that the defendant had proved the existence of the mitigating factor. Thus, the jury's affirmance of that statement in response to the two ques-

---

[30] The defendant repeatedly objected to the phraseology of the special verdict form prior to its submission to the jury, claiming, as he does on appeal, that the form's "No" answers to the questions on mitigating factors did not necessarily require a unanimous verdict. The defendant provided the trial court with his own proposed special verdict form and, in the alternative, suggested changes in the form ultimately submitted to the jury. The trial court, however, overruled the defendant's objections.

tions on mitigating factors definitively established only that *one or more of its members had not found* the existence of those factors; the answers do not necessarily establish that the jury *had unanimously rejected any of the mitigating factors.* Although it is *possible,* in light of the responses to the special verdict form, that the jury had unanimously rejected the mitigating factors, it is equally possible that eleven of the twelve jurors found that the defendant had proved one or more of the mitigating factors. It cannot be determined, therefore, solely upon review of the special verdict form, whether the jury's responses on the statutory and nonstatutory mitigating factors were unanimous. Under our decision in *Daniels,* however, a capital jury cannot properly render a verdict of "no mitigating factor" unless each and every juror has rejected each and every mitigating factor. Because a sentence of death may not be imposed unless the jury finds at least one aggravating factor *and unanimously rejects all of the mitigating factors,* the special verdict form must clearly and accurately reflect the jury's vote on those factors. On its face, the special verdict form submitted to and completed by the jury did not satisfy this requirement.

Furthermore, because of the wording of the "no" answers on the special verdict form, a jury disagreeing on the existence of a mitigating factor nonetheless reasonably could have believed that a verdict of "no mitigating factor" would be appropriate. See *State* v. *Ross,* supra, 230 Conn. 285. Thus, the unintended effect of the form's misleading language was to direct the jury to render a verdict by choosing one of the two answers: "Yes," if the jury had unanimously found a mitigating factor, or "No," if it had not. " 'While a defendant is not entitled to an instruction that a jury may "hang" . . . he is entitled to a jury unfettered by an order to decide. . . .' " (Citations omitted.) *State* v. *Peary,* 176 Conn. 170, 184, 405 A.2d 626 (1978), cert. denied, 441 U.S. 966, 99

S. Ct. 2417, 60 L. Ed. 2d 1072 (1979); *State* v. *Ralls*, 167 Conn. 408, 421–22, 356 A.2d 147 (1974). The special verdict form violated this principle—and, as a consequence, the requirement of a unanimous verdict—by indicating to the jury that a finding of "no mitigating factor" was the correct verdict so long as at least one juror had rejected a mitigating factor.

The state acknowledges that the wording of the special verdict form was not ideal and concedes that a better formulation of the "no mitigating factor" response would have been "No. We unanimously reject all mitigating factors."[31] The state argues, however, that when the special verdict form is read in the context of the jury instructions, the jury could not reasonably have believed that it was permitted to render findings of "no mitigating factor" unless it had unanimously rejected the mitigating factors.[32] We do not agree with the state's argument that the jury instructions cured the defect in the special verdict form.

The trial court did, on one occasion, expressly instruct the jury that its verdict on the mitigating factors had to be unanimous. This instruction, given during that portion of the charge wherein the trial court explained to the jury that the defendant need not unanimously convince each juror of the existence of the same mitigating factor,

---

[31] The following statement also would have sufficed: "No, we unanimously conclude that the defendant has not proved the existence of a mitigating factor."

[32] It is well established that "a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Ali*, 233 Conn. 403, 422, 660 A.2d 337 (1995).

stated as follows: "[The d]efendant has listed for you a number of mitigating factors, the statutory mitigating factor and the other, all of which he's argued to you that he's proved by a preponderance of the evidence. I charge you again that *although you must be unanimous in a finding that no mitigating factor has been proven*, in the event that all of you agree that a mitigating . . . factor has been proven, it is not necessary that you all agree as to a specific mitigating factor. If each of you agree that he or she is satisfied that one or more mitigating factors have been established, then you would be unanimous in your conclusion that a mitigating factor exists." The state also points to the trial court's repeated references to the unanimity requirement in its charge on the role of the jury,[33] claiming that the totality of the trial court's instructions provided the jury with sufficient

---

[33] The trial court's instructions included the following references to unanimity· "Be mindful of the fact, ladies and gentlemen, especially in a capital case, the jury is to serve as the link between contemporary community standards or contemporary community values and standards of decency and the penal system and that *a man is not to be condemned unless a fairly selected jury unanimously agrees that he should. . . .*

"Although it's expected and desired that all members of the jury make a frank and full exchange of ideas and views and perspectives on the issues they must decide, and it's true that *the goal of such discussions is to reach a unanimous consensus on each of the issues presented,* no juror is expected to join in an apparent consensus simply for the purposes of doing so unless his or her conscience compels that result. It would be as much of a violation of one's oath as a juror to subscribe to a verdict with which one did not agree as to refuse to deliberate at all. Indeed, it would practically deny both the state and the defendant their respective rights to the judgment of the entire community as reflected in the makeup of this jury. And if some jurors did not fairly speak their minds and vote their conscience in reaching *their unanimous verdict.*

"Thus, ladies and gentlemen of the jury, discuss all of the matters before you *with an eye to reaching unanimous agreement* and agree if in conscience you can, but do not abdicate your solemn responsibility to render a honest, personal verdict based on your own views and conscience, based upon your examination and review of the evidence that you heard and the exhibits which will be before you.

"Both the state and the defendant are *entitled to a jury of twelve, not ten, not eleven or some less than that.*" (Emphasis added.)

guidance to eliminate any confusion that might have resulted from the special verdict form.

We need not decide whether curative language in the instructions might have been sufficient to remedy the ambiguity created by the wording in the special verdict form of the "No" answers to the interrogatories concerning mitigating factors. The charge, in fact, exacerbated the ambiguity in the verdict form. On two separate occasions, the trial court, in explaining to the jury how it was to answer the questions on statutory mitigating factors, instructed the jury as follows: "Again, you will find a yes, we the jury unanimously agree that the defendant has proved a mitigating factor by a preponderance of the evidence. That is the statutory mitigating factor. If that is your result, all twelve will sign under the yes and you will not sign under the no. If that's not the result, *that is, if you do not unanimously agree that he's proved this mitigating factor, you will then sign under the no on that mitigating factor.*" (Emphasis added.) The court repeated the same instruction in its charge to the jury on nonstatutory mitigating factors. This improper formulation of the issue, in terms identical to the incorrect language of the special verdict form, increased the risk of jury misunderstanding.

Furthermore, by directing the jury to answer "No" if it was unable to answer "Yes," the trial court expressly equated the jury's failure *unanimously* to find a mitigating factor with a "No" answer to the question. In so doing, the court mischaracterized the role of the jury in precisely the same manner as the improper language of the special verdict form: the jury was improperly told that it should answer "No" *if it could not unanimously agree on the existence of a mitigating factor.* The jury should instead have been told that it could answer "No" to the question of mitigating factors only *if it unanimously agreed that the defendant had not proved any*

*mitigating factor.*[34] On the whole, therefore, the trial court's instructions, instead of ameliorating the improper language of the special verdict form, focused the jury's attention on the misleading language, thereby compounding the impropriety of the form.

Finally, the state claims that the individual polling of the members of the jury ensured that they had unanimously rejected all mitigating factors. We do not agree. The clerk simply read the special verdict form verbatim, and then inquired of each juror if the form accurately reflected his or her response. Although each juror answered affirmatively, the answers, because they were based solely on the form itself, provide no support whatever for the state's claim.

When trial error is of a constitutional magnitude, the state bears the burden of establishing that there is no reasonable possibility that the error affected the verdict. If, on the other hand, the error does not rise to the level of a constitutional violation, then a new trial is required only if the accused can demonstrate that the error probably affected the verdict. See *State* v. *Woods*, 234 Conn. 301, 308, 662 A.2d 732 (1995); *State* v. *Ali*, 233 Conn. 403, 422–23, 660 A.2d 337 (1995). The defendant, relying on our conclusion in *Daniels* that "[t]he heightened reliability demanded by the Eighth Amendment in the determination whether the death penalty is appropriate . . . convinces us that jury unanimity is an especially important safeguard at a capital sentencing hearing"; (citation omitted; internal quotation marks omitted)

---

[34] The state also claims that the trial court's explanation to the jury that the defendant need only establish jury unanimity as to any one mitigating factor further ameliorated the improper language of the special verdict form. That instruction, however, apprised the jury only that the defendant may *establish* a mitigating factor without unanimity on each factor, and did not explain to the jury that it must *unanimously reject* all of the mitigating factors before rendering a verdict of "no mitigating factor." Accordingly, the instruction lends little, if any, support to the state's argument.

*State* v. *Daniels*, supra, 207 Conn. 389; argues persuasively that the language of the special verdict form and the jury charge constituted error of a constitutional dimension. Even if we were to conclude otherwise, however, we are convinced, even upon application of a nonconstitutional standard of review, that there was a reasonable probability that the jury was misled by the erroneous language of the jury charge and the special verdict form.[35] *State* v. *Ali,* supra, 423. We are unable to say,

---

[35] Although the issue was not raised by the defendant, the special verdict form was defective in a second respect. Under the federal constitution, a capital defendant need not convince each juror of the existence of the same mitigating factor; the death penalty may not be imposed so long as the defendant satisfies each juror of the existence of any mitigating factor. See *McKoy* v. *North Carolina,* 494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990); *Mills* v. *Maryland,* 486 U.S. 365, 375–76, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988). The defendant may not be sentenced to death, therefore, if each juror finds at least one of the statutory or nonstatutory mitigating factors alleged by the defendant. The special verdict form submitted to the jury in this case, however, required the jury first to state whether they were unanimous as to the statutory mitigating factors and then, in a separate question, whether they had unanimously found a nonstatutory mitigant. As drafted, the form did not allow the jury to report a unanimous verdict in circumstances where one or more of the jurors had found a statutory mitigating factor and all the remaining jurors had found a nonstatutory mitigating factor.

The trial court's supplemental jury instructions, moreover, are likely to have exacerbated this problem with the format of the special verdict form. In response to the jury's request for a definition of the statutory and nonstatutory mitigating factors, the court stated: "Now, let me just reiterate one thing and that is with respect to the nonstatutory mitigating factors . . . the law does not require that you all agree as to the existence of a single factor, but *it does require that you all agree that there is in existence a nonstatutory factor* which you consider mitigating. In other words, you have to all agree that there is a mitigating factor. You need not agree in point of fact that it is the same one." (Emphasis added.) These instructions were misleading insofar as they suggested to the jury that the defendant bore the burden of satisfying each juror of the existence of a nonstatutory mitigating factor regardless of whether any such juror had also found a statutory mitigating factor.

We need not consider this issue further in light of our determination that a new sentencing hearing is required. At the new hearing, however, the trial court must clearly apprise the jury that the defendant need only satisfy each juror of the existence of any statutory or nonstatutory mitigating factor, and

therefore, that the verdict was based upon the jury's unanimous rejection of the mitigating factors. A death sentence cannot be imposed in such circumstances. *State* v. *Daniels,* supra, 389. Consequently, we reverse the judgment with respect to the imposition of the death penalty and remand for a new sentencing hearing.[36]

B

The defendant also claims that the trial court's instructions improperly failed to apprise the jury that it was responsible for deciding whether he would receive the death penalty. The defendant contends that as a consequence of the improper jury instructions, he was deprived of his eighth amendment right to "a capital sentencing jury [that] recognize[d] the gravity of its task and proceed[ed] with the appropriate awareness of its 'truly awesome responsibility.' " *Caldwell* v. *Mississippi,* 472 U.S. 320, 341, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), quoting *McGautha* v. *California,* 402 U.S. 183, 208, 91 S. Ct. 1454, 28 L. Ed. 2d 711 (1971); see also *Romano* v. *Oklahoma,* 510 U.S. 943, 114 S. Ct. 2004, 129 L. Ed. 2d 1 (1994); *Dugger* v. *Adams,* 489 U.S. 401, 407, 109 S. Ct. 1211, 103 L. Ed. 2d 435 (1989); *Darden* v. *Wainwright,* 477 U.S. 168, 184 n.15, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986). In light of our reversal for a new sentencing hearing, we need not decide whether the jury instructions themselves would have constituted grounds for reversal. We take this opportunity, however, to recognize that great care must be taken by the trial court to ensure

the special verdict form must allow the jury to report any such finding in similarly clear terms.

[36] At the new sentencing hearing to be held on remand, the state will again bear the burden of proving the existence of an aggravating factor beyond a reasonable doubt; see *State* v. *Ross,* supra, 230 Conn. 258; and the defendant will bear the burden of proving the existence of a mitigating factor by a preponderance of the evidence. If the state fails to prove the existence of an aggravating factor, or the defendant proves the existence of a mitigating factor, a sentence of death shall not be imposed. General Statutes § 53a-46a (f); cf. Public Acts 1995, No. 95-19.

that a capital sentencing jury fully appreciates the momentous nature of its duty and, in particular, that the jury not be "led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell* v. *Mississippi,* supra, 329.

Under § 53a-46a (f), the jury does not impose the death penalty; as in other criminal cases, the actual imposition of sentence in a capital case is the province of the court. The jury similarly does not expressly decree that the death penalty shall be imposed. The jury does, however, make specific findings on aggravating and mitigating factors from which the imposition of the death penalty or, in the alternative, a sentence of life without the possibility of release, necessarily follows. Thus, under our statutory scheme, the jury, and not the court, determines whether a defendant who has been convicted of a capital crime will be sentenced to death or to life imprisonment without the possibility of release. In view of the "[e]ighth [a]mendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case' "; *Caldwell* v. *Mississippi,* supra, 472 U.S. 323, quoting *Woodson* v. *North Carolina,* 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976); see *State* v. *Ross,* supra, 230 Conn. 230; the jury must be fully aware of its determinative role in our capital sentencing process.

The defendant claims that the trial court's jury instructions conveyed the false impression that the jury was not ultimately responsible for deciding the defendant's fate. Specifically, the defendant points to several portions of the jury charge wherein the trial court explained that the court, rather than the jury, was responsible for imposing sentence on the defendant.[37]

[37] The defendant cites to three separate passages from the trial court's charge in support of his argument that the jury was misled about the true nature of its task. First, in describing the jury's function at the penalty phase

Other portions of the trial court's instructions, however, contained several express references to the fact that the nature of the defendant's sentence would be determined by the jury.[38] In addition, the trial court carefully explained to the jury the extraordinary importance

of the trial, the trial court stated: "Your *sole responsibility* in this portion of the trial is to decide . . . whether or not [aggravating and mitigating] factors exist, and then to inform the court of your findings with respect to [such] factors by rendering a special verdict . . . . *Thus, although you have been previously made aware of the fact that the defendant's sentence on the capital felony will ultimately depend on your findings, it's your function to make the required findings and not to designate or impose the sentence. That is a responsibility that is solely vested in me as the judge* . . . ." (Emphasis added.)

The defendant next directs our attention to the following language of the jury charge: "You should clearly understand that in this state *the explicit and limited function of the penalty phase jury is not to impose sentence but is to find the facts upon which the ultimate position of the sentence will prepare.* . . . Your task is to determine whether or not each [mitigating] factor which is laid before you and described to you exists." (Emphasis added.)

The last passage relied on by the defendant provides: "*Even though you will not be expressly deciding the life or death question in this case,* you and you alone will be responsible for determining the existence of the factors upon which the defendant's liability, his exposure for the imposition of the death penalty depends." (Emphasis added.)

[38] For example, the trial court began its penalty phase instructions with the following statement: "In my orientation statement and during the questioning by counsel in the voir dire, you were advised that in the event that you found the defendant guilty of capital felony, that it would then be your duty to hear evidence of claimed aggravating and mitigating factors *as the basis upon which the court would be required to impose sentence.*" (Emphasis added.)

The trial court thereafter provided the jury with a detailed explanation of the capital sentencing scheme, quoting extensively from the pertinent language of § 53a-46a. After summarizing the nature and purpose of the sentencing hearing and the jury's role in considering alleged mitigating and aggravating factors, the trial court further described the function and responsibility of the jury as follows: "Subsection (e) of the statute provides that the jury shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor. *And subsection (f) provides that if the jury finds that the aggravating factor claimed by the state exists and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury finds that the aggravating factor claimed by the state does not exist or that one or more of the mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release. Subsection (g) of the statute provides that the court*

of its role in light of the unique nature of the penalty faced by the defendant.[39]

We need not decide whether, on balance, the trial court instructions accurately described the functions of

---

shall not impose the sentence of death on the defendant if the jury finds by special verdict that any mitigating factor exists." (Emphasis added.)

The trial court also repeatedly advised the jury that the death penalty could not be imposed "unless the state has satisfied the jury beyond a reasonable doubt that the aggravating factor alleged by the . . . state has been proven," and that the jury's failure to find an aggravating factor would therefore require the court to impose a sentence of life imprisonment without the possibility of release." (Emphasis added.)

The trial court further instructed the jury that "even if you find the existence of a statutory aggravating factor proved beyond a reasonable doubt by the state, the court may not impose the death penalty if the special verdict that you return includes a finding that the defendant has proven one or more mitigating factors by a preponderance of the evidence. In that event or in the event that you find no aggravating factor was proven, the court must under either of those circumstances sentence the defendant to life imprisonment without the possibility of release." (Emphasis added.)

Moreover, the trial court, in explaining the mitigating factors to the jury, repeatedly characterized those factors as circumstances "which in fairness and mercy may be considered as tending either to extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death." (Emphasis added.)

[39] The trial court first explained to the jury its duty carefully to consider all of the evidence offered by the defendant in mitigation: "Under the United States constitution any criminal defendant facing the possibility of the imposition of the death penalty has the absolute right to present evidence to you in support of any such mitigating factor and to have his sentencer, that is, the court or jury as the case may be, consider such factor. The death penalty by its very nature is qualitatively different from any other form of punishment. It's therefore essential as well as constitutionally mandated that the sentencer possess and consider the fullest information possible concerning the defendant's character, background, and history, and life's characteristics. If such were not the case, then particularized and individualized sentence determinations could not be made. And society would have no assurance that a just and proper result truly consistent with society's . . . values and reflective of the conscience of the community has been reached in this case. The requirement that sentencers consider and not disregard any mitigating factor reflects on our fundamental respect for humanity which underlies our state law and the eighth amendment to the United States constitution."

The court thereafter admonished the jury of its special responsibility in a capital case: "I want to remind you of the gravity of your task in this case. Death is a different kind of punishment from any other which may be imposed

the court and the jury without leading the jury to believe that it was not ultimately responsible for the sentencing decision. It is imperative, however, that the jury instructions in a capital case clearly and unequivocally explain to the jury that it is solely responsible for determining whether the defendant will receive the death penalty or, instead, a sentence of life imprisonment without the possibility of release. We therefore caution the trial court at the new hearing to refrain from the use of any language suggesting that the judge's responsibility extends beyond merely implementing the jury's findings. To this end, any instruction by the trial court indicating that the court rather than the jury will actually impose sentence should also repeat the instruction that the court is bound to impose sentence in accordance with the jury's findings on mitigating and aggravating factors and, consequently, that the responsibility for deciding whether the defendant will receive a sentence of death or life imprisonment without the possibility of release rests with the jury.

---

in this country. From the point of view of the defendant [it] is different both in its certainty and its finality. From the point of view of society the action of the state in taking the life of one of its citizens differs dramatically from any other state action. It's of vital importance to the defendant and the community that any decision to impose the death sentence be based on a reason rather than on caprice or emotion. Even though you will not be expressly deciding the life or death question in this case, *you and you alone will be responsible for determining the existence of the factors upon which the defendant's liability, his exposure for the imposition of the death penalty depends*. In making these determinations, then, you must be especially [vigilant] not to find the existence of an aggravating factor or refuse to find the existence of any mitigating factor because of prejudice or compassion or public opinion. Rather, you must approach this entire inquiry with a full and fair consideration to all of the mitigating evidence by the defendant as presented or the evidence that this hearing suggests and you will also give full and fair consideration to all of the evidence with regard to the aggravating factor.

"Be mindful of the fact, ladies and gentlemen, especially in a capital case, the jury is to serve as the link between contemporary community standards or contemporary community values and standards of decency and the penal system and that a man is not to be condemned unless a fairly selected jury unanimously agrees that he should be." (Emphasis added.)

Furthermore, in view of the determinative role of the jury in our capital sentencing scheme, we are persuaded that the special verdict form submitted to the jury should contain a prefatory statement briefly reiterating the nature of the jury's responsibility. Accordingly, under our inherent supervisory power over the administration of justice; see *State* v. *Patterson*, 230 Conn. 385, 397, 645 A.2d 535 (1994); *State* v. *Ross*, 208 Conn. 156, 158–59, 543 A.2d 284 (1986); we direct that the special verdict form shall include the following introductory statement: "As you have been instructed, your factual findings will determine whether the defendant will be sentenced to *death* (the defendant will receive the death penalty if you unanimously find that the state has proved the existence of an aggravating factor beyond a reasonable doubt *and* you unanimously find that the defendant has not proved the existence of any mitigating factor by a preponderance of the evidence) or to *life imprisonment without the possibility of release* (the defendant will be sentenced to life imprisonment without the possibility of release if you unanimously find that the state has not proved the existence of an aggravating factor beyond a reasonable doubt *or* if you unanimously find that the defendant has proved any one of the mitigating factors by a preponderance of the evidence, although you need not agree on which of the mitigating factors the defendant has proved). Accordingly, your answers to the following questions on aggravating and mitigating factors shall constitute your verdict in this case."[40]

## C

The defendant next claims that the trial court improperly failed to instruct the jury that extreme emotional

---

[40] We disagree with the dissent's contention that § 53a-46b *requires* the trial court to impose a sentence of life imprisonment without the possibility of release unless the jury unanimously finds the existence of an aggravating factor. As we have previously indicated, the trial court may declare a mistrial and order a new sentencing hearing when the jury fails to make a unanimous

disturbance is a statutory, rather than a nonstatu-
tory, mitigating factor.[41] Specifically, he contends that
because extreme emotional disturbance is an affirmative
defense to murder under § 53a-54a (a), the legislature
must have intended that extreme emotional disturbance
be treated as a statutory mitigating factor under § 53a-
46a (g) even though it is not expressly enumerated there-
under. We disagree.

Our fundamental objective in construing a statute is
to ascertain and effectuate the apparent intent of the
legislature; *Fleming* v. *Garnett*, 231 Conn. 77, 91–92, 646
A.2d 1308 (1994); and the appropriate starting point for
our analysis is the statutory language itself. The legisla-
ture has enumerated five mitigating factors under § 53a-
46a (g); see footnote 3; and extreme emotional distur-
bance is not among them. "Unless there is evidence
to the contrary, statutory itemization indicates that the
legislature intended the list to be exclusive." (Internal
quotation marks omitted.) *Bridgeport Hospital* v. *Com-
mission on Human Rights & Opportunities*, 232 Conn.
91, 101, 653 A.2d 782 (1995). The defendant offers no
explanation why the legislature would have omitted
extreme emotional disturbance from the list of mitigating
factors under § 53a-46a (g) if it had intended that
extreme emotional disturbance be included as a statu-
tory mitigant. Furthermore, the defendant does not argue
that the legislature could not rationally have chosen to

---

finding on either mitigating or aggravating factors. *State* v. *Daniels*, supra,
207 Conn. 388–89, 394.

[41] The trial court did instruct the jury to consider the defendant's claim
of extreme emotional disturbance as a nonstatutory mitigating factor. The
defendant, therefore, does not claim that he was deprived of his right to the
jury's consideration of relevant mitigating evidence; he argues only that the
jury should have been instructed that extreme emotional disturbance, if
proven, is automatically a mitigating factor and that the jury need not find,
as with nonstatutory mitigating factors, that the emotional disturbance was
"mitigating in nature, considering all the facts and circumstances of the case."
General Statutes § 53a-46a (d).

exclude extreme emotional disturbance as a statutory mitigating factor under § 53a-46a. Since there is nothing in the pertinent legislative history or the statutory language to support the defendant's contention, we conclude that § 53a-46a reflects the intent of the legislature "to exclude that which is not specifically stated." *State* v. *Kish*, 186 Conn. 757, 765, 443 A.2d 1274 (1982). Accordingly, we reject the defendant's claim.

## D

The defendant also asserts that the trial court improperly failed to instruct the jury on each and every one of the mitigating factors alleged by the defendant and improperly refused to submit his proposed list of mitigating factors to the jury.[42] The trial court denied the defend-

---

[42] The defendant submitted the following proposed list of mitigating factors: "Defendant's List of Mitigating Factors

A. *Statutory Mitigating Factors*

1. At the time of the offense the defendant was under the influence of extreme emotional disturbance.

2. At the time of the offense the defendant's mental capacity was [significantly] impaired—but not so impaired as to constitute a defense to prosecution.

3. At the time of the offense the defendant's ability to conform his conduct to the requirements of law was [significantly] impaired—but not so impaired as to constitute a defense to prosecution.

B. *Non-Statutory Mitigating Factors*

1. At the time of the offense the defendant was under the influence of extreme emotional disturbance.

2. At the time of the offense the defendant's mental capacity was impaired.

3. At the time of the offense the defendant's ability to conform his conduct to the requirements of law was impaired.

4. The defendant has been a well-behaved and well-adjusted prisoner during his incarceration for this offense.

5. If sentenced to life imprisonment without possibility of release the defendant could lead a useful and productive life while incarcerated and would not pose a danger to guards or other prisoners.

6. Prior to the offense the defendant had lived a productive, hardworking life.

7. The defendant suffered physical, sexual, emotional and/or psychological abuse and/or disturbance as a child and youth.

8. The defendant is the product of a pathological family unit.

9. Mercy.

ant's requests to instruct the jury on the specific mitigating factors and to provide the jury with a written list of those factors on the ground that to do so might suggest to the jury that its consideration of mitigating factors was limited to the factors expressly enumerated by the court. See, e.g., *People* v. *Spreitzer*, 123 Ill. 2d 1, 40–41, 525 N.E.2d 30, cert. denied, 488 U.S. 917, 109 S. Ct. 274, 102 L. Ed. 2d 263 (1988) (jury might understand that written list including nonstatutory mitigating factors is exhaustive and, consequently, fail to consider other unenumerated nonstatutory mitigants). According to the defendant, the trial court's action deprived the jury of the guidance it needed for a meaningful opportunity to consider and give effect to mitigating evidence. The failure so to instruct, the defendant claims, violated his eighth amendment right to a capital sentencing proceeding that ensures reliability in the determination of whether, in view of the defendant's background, character and crime, death is the appropriate punishment. See *Penry* v. *Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989); *Lockett* v. *Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). On remand, such a list should be provided to the jury.

A "prerequisite for a valid death penalty statute is that . . . it must . . . focus the sentencer's attention on the character and record of the individual offender and the circumstances of the particular offense. [T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Ross*, supra, 230 Conn.

10. Any other factor in the circumstances of the case and the defendant's character, history and background that a juror or jurors consider mitigating."

233. The capital sentencer, therefore, must be allowed to consider all relevant mitigating evidence in order to "make a reasoned moral and individualized determination based on the defendant's background, character and crime that death is the appropriate punishment." Id., 240; see *Blystone* v. *Pennsylvania,* 494 U.S. 299, 307–308, 110 S. Ct. 1078, 108 L. Ed. 2d 255 (1990).

In the present case, the trial court gave the defendant wide latitude to introduce mitigating evidence. Furthermore, the trial court's instructions accurately and thoroughly explained to the jury the nature of statutory and nonstatutory mitigating factors generally, emphasizing that the defendant had the right to present "the fullest information possible concerning the defendant's character, background and history" and that the jury was obligated to give "full and fair consideration to all of the mitigating evidence." See footnote 39. Finally, the trial court provided the jury with a detailed explanation of the statutory mitigating factor relating to whether the defendant's ability to conform his conduct to the law was significantly impaired[43] and focused the jury's attention on the mitigating evidence with specific reference to the defendant's witnesses.

We nevertheless are persuaded that the recounting of the claimed nonstatutory mitigating factors by the trial court may assist jurors in their consideration of the mitigating evidence. Accordingly, at the new hearing, the trial court should, *if requested by the defendant,* instruct the jury on each of the statutory *and* nonstatutory mitigating factors claimed by the defendant and, *again, if requested,* submit to the jury an accurate written list of

---

[43] Although the defendant claimed extreme emotional disturbance as both a statutory and a nonstatutory mitigating factor; see footnote 42; we have already concluded that the trial court properly refused to instruct the jury that extreme emotional disturbance was a statutory mitigating factor.

those mitigating factors.[44] Although we share the trial court's concern that a court could, in specifically enumerating the mitigating factors, convey the false impression that the list is exclusive, thereby foreclosing the jury's consideration of other unenumerated mitigating factors we are confident that a properly crafted cautionary instruction will eliminate the possibility of any such misunderstanding.[45]

## E

The defendant's final claim of instructional error is that the trial court incorrectly charged the jury on the definition of mitigating factors. Specifically, the defendant contends that the court's omission of the statutory language "or to otherwise constitute a basis for a sentence less than death" from the definition of mitigating factors[46] impaired the jury's ability to give full consideration and effect to the defendant's mitigating evidence. Because of the omission, the defendant asserts that the jury might have believed that a factor was mitigating only if it reduced culpability or blame for the offense, when a factor also could have been mitigating if it "otherwise constitute[d] a basis for a sentence less than death." Although the defendant acknowledges that the trial court

[44] The trial court must enumerate for the jury the defendant's claimed statutory mitigants, whether or not there is a specific request to do so. The court, however, should not specifically list the alleged nonstatutory mitigating factors, either in its charge or in a written submission to the jury, unless requested by the defendant.

[45] Both the trial court's cautionary instruction and the written list submitted to the jury should emphasize, in language such as that contained in the defendant's nonstatutory mitigating factor No. 10; see footnote 42; that the jury shall also determine whether the defendant has proved any other unenumerated mitigating factor.

[46] Section 53a-46a (d) provides in relevant part that "[m]itigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death." See footnote 3.

twice recited the complete statutory definition, he argues that the jury was likely to have been confused because, on two other occasions, the court recounted the truncated version of the statutory definition. In light of our reversal on other grounds, we need not resolve this claim. At the new sentencing hearing the trial court's instructions on mitigating factors should consistently include the complete statutory definition.

## IV

### EVIDENTIARY RULING

The defendant next claims that the trial court improperly permitted the jury to consider certain testimony of Borden as proof of the aggravating factor that the defendant committed the two murders in an especially cruel manner. Borden testified that in his opinion, at the time of the murders, the defendant's mental capacity and ability to conform his conduct to the requirements of the law had been significantly impaired and the defendant had been suffering from extreme emotional disturbance. See part II B of this opinion. In explaining the reasons for his conclusions, Borden further testified that the defendant had graphically described the two murders during one of his interview sessions with the defendant and, with the aid of his interview notes, Borden provided the jury, on direct examination, with a detailed summary of the defendant's version of the offense. Because the defendant's description of the murders substantially corroborated the testimony of the state's witnesses, Katsnelson and Lee, the prosecutor, in his closing argument, urged the jury to consider Borden's recitation of the defendant's statement as evidence that the defendant had committed the murders in an especially cruel manner. On appeal, the defendant asserts that the trial court's failure either to bifurcate the sentencing hearing or to instruct the jury that it could only consider the state's evidence in determining the exis-

tence of an aggravating factor violated his rights under the eighth and fourteenth amendments to the federal constitution[47] and the provisions of § 53a-46a (c). We do not agree.

The defendant's constitutional argument is twofold: first, he claims that it was fundamentally unfair for the jury to have considered evidence presented by the defendant in mitigation of the death penalty as proof of an aggravating factor, and second, he contends that because evidence relevant to mitigating factors need not otherwise comport with the rules of evidence; see General Statutes § 53a-46a (c); the use of such evidence to establish an aggravating factor is inconsistent with the need for heightened reliability in capital cases. See *State* v. *Ross*, supra, 230 Conn. 230. Although he offers no case law or other authority to substantiate these claims, the defendant nonetheless contends that a capital defendant who presents evidence in mitigation has a federal constitutional right to preclude the state from using such evidence against him for purposes of establishing an aggravating factor.

" '[A] system of capital punishment [must be] at once consistent and principled but also humane and sensible to the uniqueness of the individual. . . . [It must] serve both goals of measured, consistent application and fairness to the accused.' " Id., 231, quoting *Eddings* v. *Oklahoma*, 455 U.S. 104, 110–11, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982). We have previously concluded that § 53a-46a, on its face, satisfies these constitutional principles because it requires the state to prove a statutory aggra-

---

[47] The defendant also claims that the trial court's ruling violated his rights guaranteed by article first, §§ 8 and 9, of the Connecticut constitution. Because he has failed to provide an independent analysis of his claim under the state constitution, we shall limit our review of this issue to the defendant's claim under the United States constitution See, e.g., *State* v. *Carter*, 228 Conn. 412, 117 n.6, 636 A.2d 821 (1994); *State* v. *Walton*, 227 Conn. 32, 62 n.24, 630 A.2d 990 (1993)

vating factor and it allows the defendant broad leeway to introduce any relevant evidence in mitigation of the death penalty. *State* v. *Ross*, supra, 230 Conn. 230–44. Furthermore, the United States Supreme Court has upheld the constitutionality of death penalty statutes that authorize the capital sentencer not only to consider the mitigating and aggravating evidence together, but also to weigh the evidence of mitigating and aggravating circumstances in order to determine the appropriate sentence. See, e.g., *Pulley* v. *Harris*, 465 U.S. 37, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984); *Jurek* v. *Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976). In view of the protections afforded capital defendants under our death penalty scheme, we are not persuaded that considerations of fairness militate against allowing the state to argue that some of the evidence adduced by the defendant in mitigation also tends to prove an aggravating factor.

We are dubious, as well, of the defendant's second federal constitutional claim, namely, that evidence offered in mitigation of the death penalty should not be available for use by the state to prove an aggravating factor because relevant mitigating evidence need not otherwise satisfy our evidentiary rules. Although the defendant claims that it is unfair to let the state prove an aggravating factor in reliance on evidence that does not meet threshold standards of admissibility, the defendant does not explain why, as a matter of federal constitutional law, evidence that is sufficiently reliable for purposes of establishing a mitigating factor is necessarily of insufficient reliability to establish an aggravating factor. Nevertheless, we need not decide today whether a capital defendant would never be entitled to the relief sought here. In this case, the defendant makes no claim that Borden's testimony regarding the defendant's description of the murders was inadmissible under our

evidentiary rules.[48] Accordingly, the defendant cannot demonstrate that he was prejudiced by the introduction of any inherently unreliable evidence.

For the same reason, we reject the defendant's contention that the jury's consideration of the mitigating evidence to prove the aggravating factor was prohibited by § 53a-46a (c), which provides in pertinent part that "the admissibility of information relevant to any of the aggravating factors set forth in subsection (h) shall be governed by the rules governing the admission of evidence in . . . trials [of criminal matters]." The defendant has not demonstrated that the mitigating evidence relied on by the state as proof of the aggravating factor failed to qualify for admission under the rules of evidence. Thus, he has not proven any violation of § 53a-46a (c).

## V

## CONCLUSION

The defendant stands convicted of capital felony for the double murder of his former wife and son, an atrocious crime that the legislature has determined may justify the death penalty. Furthermore, the evidence adduced by the state at the sentencing phase of the trial was sufficient to warrant the jury's finding that the defendant committed the offense in an especially cruel

[48] The defendant does claim that the use of Borden's testimony to prove an aggravating factor violated Practice Book § 760, which provides in relevant part: "In an appropriate case the judicial authority may, upon motion of the prosecuting authority, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose in the order of the court. No statement made by the defendant in the course of any examination provided for by Sec. 757 . . . shall be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding." We reject this argument, however, for it "ignores § 760's preclusion of the evidence only on the issue of *guilt*." (Emphasis added.) *State* v. *Raguseo*, 225 Conn. 114, 134, 622 A.2d 519 (1993). Because § 760 applies only to the guilt phase of the trial, it is of no help to the defendant.

manner. "Imposition of the death penalty, however, requires more. Even a defendant who has offered no . . . excuse for his felonious conduct is entitled to have a sentencing jury consider extenuating circumstances that may explain his behavior and mitigate his moral culpability and may therefore counsel against the ultimate sanction of death." *State* v. *Ross*, supra, 230 Conn. 286. Integral to the right of a capital defendant to demonstrate the existence of any such extenuating circumstances is the need for a verdict that unambiguously establishes the jury's unanimous finding that there was no factor in mitigation of the death penalty. Because it is not clear from the verdict returned by the jury that it had unanimously rejected each and every mitigating factor claimed by the defendant, his death sentence cannot stand.

The defendant's conviction is affirmed with respect to his guilt of one count of capital felony. The judgment is reversed, however, with respect to the imposition of the death penalty and the case is remanded to the trial court for a new sentencing hearing pursuant to § 53a-46a.

In this opinion PETERS, C. J., and CALLAHAN and FOTI, Js., concurred.

BERDON, J., dissenting. I continue to adhere to my view that the imposition of the death penalty constitutes cruel and unusual punishment under our state constitution and is therefore prohibited. *State* v. *Ross*, 230 Conn. 183, 286, 646 A.2d 1318 (1994) (*Berdon, J.*, dissenting), cert. denied, U.S. , 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). Accordingly, I would remand this case to the trial court, not for a new sentencing hearing as the majority does, but rather for the imposition of the sentence of life imprisonment without the possibility of release.[1]

---

[1] General Statutes (Rev. to 1995) § 53a-46a (f); see footnote 3 of the majority opinion.

Justice Palmer today becomes the third justice of this seven justice court to hold that the imposition of the death penalty does not offend our state constitution. He joins Chief Justice Peters and Justice Callahan, who were in the majority in *State* v. *Ross*, supra, 230 Conn. 183, and again are part of the majority in this case.[2] These three justices, in holding that the death penalty does not constitute cruel and unusual punishment, obviously agree that it satisfies contemporary standards of decency—that is, among other things, that a sentence of death does not degrade the dignity of the human being, is not arbitrary and capricious, is not imposed in a discriminatory manner and serves a legitimate purpose. I vehemently disagree. As I wrote in my dissent in *Ross*, "[n]ot only does the death penalty degrade the individuals who are sentenced to die, but it also degrades and dehumanizes a society that permits it to be imposed, calling into question the morality of every one of us." Id., 334.

Because I explained at length in *Ross* why I believe the death penalty constitutes cruel and unusual punishment, I will not repeat that entire analysis here. Nevertheless, I feel compelled to elaborate on the discriminatory application of the death penalty. In addition, because the death penalty is the law of this state, at least until the other three justices of this court[3] have an opportunity to speak on the issue, I also address two other issues: (1) the majority's conclusion that the defendant, Robert J. Breton, Sr., failed to prove the existence of a mitigating factor; and (2) the requirement

---

[2] In *Ross*, only three Supreme Court Justices, Chief Justice Peters, Justice Callahan and Justice Berdon, were qualified to sit on the case because the remaining four justices had been disqualified. *State* v. *Ross*, supra, 230 Conn. 308 (*Berdon, J*, dissenting). In this case, Justice Palmer was qualified to sit. Three justices, Justice Borden, Justice Norcott and Justice Katz, have been disqualified in both cases, however, and have yet to address the state constitutionality of the death penalty.

[3] See footnote 2 of this dissent.

that the jury be made sufficiently aware that it alone bears the ultimate responsibility for deciding whether the defendant will live or die.

## I

In *Ross*, I explained that an important consideration in determining whether the death penalty violates contemporary standards of decency, and consequently our state constitution's ban on cruel and unusual punishment, is "the fact that the death penalty is imposed in a discriminatory fashion." *State* v. *Ross*, supra, 230 Conn. 310 (*Berdon, J.*, dissenting).

I supported this conclusion that the imposition of the death penalty is discriminatory with reports and information gathered by the federal government and statistics showing nationwide trends in the administration of the death penalty.[4] These sources demonstrated that, on a national level, the death sentence is disproportionately carried out on the poor, on African-Americans, and on members of unpopular groups. See id., 311. I further wrote that "defendants who are convicted of murdering whites are much more likely to be sentenced to death than those convicted of murdering African-Americans." Id., 310. Although I indicated that these "familiar patterns of discrimination are reflected in the current administration of the death penalty in Connecticut," I was also under the impression that there was insufficient data upon which to base a definitive conclusion. Id.

Since then, however, this court has been provided with information that suggests that the nationwide discrimination trends that I identified in *Ross* are, indeed, also occurring in Connecticut. In *State* v. *Cobb*, Supreme

---

[4] See, e.g., U.S. General Accounting Office, Death Penalty Sentencing (February, 1990); Death Penalty Information Center, Facts About the Death Penalty (November 12, 1993); The Challenge of Crime in a Free Society, A Report by the President's Commission on Law Enforcement and Administration of Justice (1967).

Court Docket No. 14384, another death penalty case pending before this court, the defendant provided this court with disturbing preliminary data, the accuracy of which the state did not challenge.[5] This data suggests that "[i]f the defendant is an African-American, he is more likely to receive the death penalty than if he were white. If the victim is white, a defendant also is more likely to receive the death penalty. If the defendant is an African-American and the victim is white, the defendant is highly more likely to receive the death penalty." *State* v. *Cobb*, 234 Conn. 735, 768, 663 A.2d 948 (1995) (*Berdon, J.*, dissenting).[6]

---

[5] In *State* v. *Cobb*, 234 Conn. 735, 764, 663 A.2d 948 (1995) (*Berdon, J.*, dissenting), the defendant "moved this court to enlarge the class of cases that we should consider in determining whether his sentence of death was proportionate to the penalty that has been imposed on other defendants in 'similar cases.' " By doing so, he argued, he would be able to demonstrate that, in Connecticut, the race of the victim and the race of the defendant impermissibly influence the decision of whether to sentence a criminal defendant to death. Id., 768. The motion in *Cobb* was not granted because a majority of the justices on this court failed to vote in favor if it. Three justices voted to grant the motion, three justices voted to deny it, and one was disqualified. Id., 769–70 n.11.

[6] The defendant in *State* v. *Cobb*, supra, 234 Conn. 735, supplied this court with data that linked the race of a criminal defendant and the race of the victim to whether that defendant ultimately was sentenced to death. "First, the data indicates that of all the defendants who have been charged with capital felony, African-American defendants have been convicted twice as often—and, therefore, have been subjected to the death penalty twice as often—as defendants who are not African-American. In other words, if a defendant who is not African-American is charged with capital felony, there is a 200 percent greater chance that the jury will return a verdict of not guilty on that charge, and therefore not subject him to the death penalty, than if the defendant is African-American.

"Second, the data indicates that the death penalty is more likely to be imposed if the victim of the crime was white or otherwise not African-American. The defendant points to several specific instances:

"(1) Those defendants who murder African-Americans are substantially less likely to be charged with capital felony and, consequently, substantially less likely to be subject to the death penalty, than those defendants who murder persons who are not African-Americans.

"(2) None of the defendants now on death row was sentenced to death for the murder of an African-American, although 40 percent of those persons

I recognize that this data is preliminary and that additional research, as well as mathematical analysis, must be conducted in order to determine whether these results are statistically significant. Nevertheless, I have no reason to believe that the administration of the death penalty will prove to be any less discriminatory in Connecticut than it has been throughout the rest of the country. Indeed, the *Cobb* data serves only to confirm what I expressed in *Ross*—that because of the racially biased manner in which we decide who shall live and who shall die, the death penalty cannot withstand state constitutional scrutiny.

## II

I disagree with the majority's conclusion that the defendant failed to prove the existence of a mitigating factor that would have prevented him from being sentenced to death. My analysis begins with the burden of persuasion that the defendant must satisfy in order to prove a mitigating factor that would spare his life. That burden of persuasion is satisfied by a preponderance of the evidence. *State* v. *Daniels*, 207 Conn. 374, 385, 542 A.2d 306 (1988). The defendant meets that burden of persuasion when he proves that "all the evidence considered fairly and impartially [induces] a reasonable belief that it is more probable than not that the fact

murdered in this state since 1976 have been African American.

"(3) Of the twenty-eight cases in which a person was convicted of capital felony, only four, or 14 percent, have involved a victim who was African-American. As indicated previously, however, 40 percent of murder victims since 1976 have been African-American.

"(4) Of the eighteen cases that have proceeded to the 'death penalty phase' hearing, only one, or 5.5 percent, involved a victim who was African-American.

"(5) If the victim was an African-American, those defendants who are accused of kidnapping and murder . . . will not be charged with capital felony, and therefore will not be subject to the death penalty.

"(6) Similarly, if the victim was an African-American, those defendants who are accused of sexual assault and murder . . . will very rarely be charged with capital felony, and therefore will very rarely be subject to the death penalty." Id., 766–68 (*Berdon, J.,* dissenting).

is true." (Internal quotation marks omitted.) *State* v. *Haggood*, 36 Conn. App. 753, 768, 653 A.2d 216 (1995); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 4.4.1, p. 73 ("[i]t is not necessary that the proof negate all other possibilities or that it reach the degree of certainty that excludes every other reasonable conclusion").

The statutory scheme enumerates the considerations that a jury must weigh when determining whether a mitigating factor exists: "Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death." General Statutes § 53a-46a (d).[7]

---

[7] General Statutes § 53a-46a (d) provides: "In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury or, if there is no jury, the court shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death."

General Statutes § 53a-46a (g) provides: "The court shall not impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict, as provided in subsection (e), that any mitigating factor exists The mitigating factors to be considered concerning the defendant shall include, but are not limited to, the following: That at the time of the offense (1) he was under the age of eighteen or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution or (4) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his

As it did in *Ross*, the majority professes to apply a "heightened" standard of review to the jury's necessary finding that the defendant had failed to prove a mitigating factor. The majority, quoting from *State* v. *Ross*, supra, 230 Conn. 259, maintains that it subjects the jury's finding to " 'the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding . . . .' " See *State* v. *Greenfield*, 228 Conn. 62, 68, 69, 634 A.2d 879 (1993) (rejecting deferential "clearly erroneous" standard of review for factual issues implicating constitutional claims; holding instead that facts found by trier must be "supported by substantial evidence"). I certainly agree that, *at the very least*, this court must adopt such a heightened standard of review in cases involving the death penalty. A punishment of death is fundamentally and qualitatively different than any other punishment that society can inflict and, as such, demands special and critical scrutiny by this court.

The majority, however, quoting from *State* v. *Ross*, supra, 230 Conn. 264, goes on to dilute that "heightened" standard by stating that it reviews "the evidence presented at the defendant's penalty hearing in the light most favorable to *sustaining* the facts impliedly found by the jury." (Emphasis added; internal quotation marks omitted.) This is the same standard of review that we apply to all factual determinations made by a jury. There is nothing "heightened" about it. Put simply, the majority on the one hand furnishes a theoretical standard of review that demonstrates concern about the finality of the penalty of death, but on the other hand applies that standard in a manner that defers to the jury's determination, even though the evidence presented would com-

---

participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (5) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person."

pellingly support a different conclusion. The theory and the practice, as demonstrated by this case, are simply inconsistent.

If this court were to apply a truly "heightened" standard of review, involving an independent and scrupulous examination of the entire record, the court would be required to conclude, as a matter of law, that the defendant proved the existence of a mitigating factor by a fair preponderance of the evidence. The defendant presented evidence that he had endured a horrible childhood and that, as an adult, he suffers from severe psychological problems. The state did not present any evidence in opposition.

The evidence presented by the defendant may be summarized as follows. The defendant's mother placed him in an orphanage when he was a little more than one year old. When she took him back three years later, "he looked like he had been horribly abused. His hair was [falling] out, he looked emaciated. He was frightened of people. He wouldn't allow anybody to touch him. He was withdrawn, and [his aunt] and others thought that something terrible had happened while he was there."

The defendant's childhood did not improve after he returned from the orphanage. The defendant's parents, who were alcoholics, "were violent people." The defendant's mother would strip him, lay him across the bed and beat him with a belt on his genitals and buttocks. This continued until the defendant was in his early to middle teens. The defendant's father repeatedly threatened to kill him. The father would make a hangman's noose, dangle it in front of the defendant, and say, "I'm going to kill you, you're never going to reach twenty-one years of age."

The defendant's parents also were preoccupied with knives and engaged in deviant sexual practices. The

defendant's father would strap knives on his body and say that if anybody got in his way, he would use the knives on them. The defendant's mother once took one of the family's pet cats, placed it in a bucket, stabbed it repeatedly and then dismembered it, placing body parts in various places around her bedroom. The defendant's father convinced the mother to prostitute herself, and the parents would host strip poker parties. The defendant's mother and other men would be naked together in the house, and the mother would expose herself to the defendant. When he was thirteen or fourteen years old, she grabbed his genitals and "attempted sexual molestation."

The defendant's psychiatrist, Walter Borden, testified that the defendant, as an adult, suffered from "severe mixed personality disorder with borderline schizoid, paranoid and depressive trends." Borden explained that the defendant's family background "is one of the most disturbed I've seen." He testified that as a result of the defendant's personality disorders, his depressive rage "caused him to destroy, to kill the very people he loved the most. That is what happened [in this case]." Borden concluded that at the time of the murders, the defendant's mental capacity and his ability to conform his conduct to the requirements of the law had been significantly impaired, and that he had been suffering from extreme emotional disturbance.

A clinical psychologist, Anne Phillips, reached a similar conclusion. She testified that the defendant suffered from a severe mixed personality disorder with schizoid, paranoid and depressive features. According to Phillips, these problems likely originated when the defendant was an adolescent. She concluded that it was likely that the defendant's mental capacity had been significantly impaired at the time of the offense.

The state did not offer any evidence in rebuttal. Instead, the state rested its case immediately upon con-

cluding its cross-examination of the defendant's witnesses after the defendant had proffered the foregoing evidence. On the basis of the evidence in the record, therefore, no jury reasonably could have concluded that the defendant had failed to prove the existence of a mitigating factor. Accordingly, the defendant's sentence of death should also be reversed on this basis and he should be resentenced to life imprisonment without the possibility of release.

## III

Finally, I am pleased that the majority has at least partially addressed the concerns that I expressed in part II of my *Ross* dissent. In *Ross*, I wrote that, although the jury was orally instructed on the consequences of their decision regarding the existence of an aggravating or mitigating factor with respect to a death sentence, such an instruction is insufficient. "While such an instruction is very beneficial, it is not a substitute for requiring the decision makers to look upon the accused—if they can—and render a verdict that society requires that he or she be put to death. It is not enough to instruct the jury that based on its factual determinations the judge will or will not impose the death penalty, because this procedure could lead the jury to believe that there is another level of decision making authority that will make the ultimate determination. If the ultimate punishment of death is to be inflicted, the decision makers must be fully aware that they have made the decision to inflict it, and this can be assured only if the decision makers are required to pronounce expressly a judgment of death." *State* v. *Ross*, supra, 230 Conn. 322 (*Berdon, J.*, dissenting).

In Connecticut, although the judge announces the formal sentence of death or life imprisonment, he or she must do so in accordance with the specific findings of the jury with regard to aggravating and mitigating

factors.[8] In reality, therefore, the jury is the sentencer, because it is the jury that makes the findings that determine whether the defendant lives or dies. "The United States Supreme Court has held that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. . . . The reason for this requirement is that the capital sentencer is thereby required to view its task as the serious one of determining whether a specific human being should die at the hands of the State. . . . Requiring that, if capital punishment is to be imposed, the sentencer must specifically state that the defendant should be put to death forces the sentencer, be it jury or judge, to confront the truly awesome responsibility of decreeing death for a fellow human [so that the sentencer] will act with due regard for the consequence of [the] decision . . . ." (Citations omitted; internal quotation marks omitted.) Id., 320. Indeed, the United States Supreme Court has held that the death penalty may only be imposed as a "reasoned *moral* response to the defendant's background, character, and crime." (Emphasis in original; internal quotation marks omitted.) *Penry* v. *Lynaugh*, 492 U.S. 302, 319, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989).

An oral instruction by the court that the jury's factual findings will be the equivalent of sentencing the defendant to death or life imprisonment does not provide a sufficient guarantee of trustworthiness that the jury truly understands the magnitude of the task that it is

---

[8] The defendant may waive his right to have a jury decide whether aggravating or mitigating factors are present. If the defendant waives this right, and if the court approves and the state consents, a three judge panel makes these determinations. See General Statutes (Rev. to 1995) §§ 53a-46a (b), 53a-45 (b). Under these circumstances, the three judge panel not only makes these factual determinations but also formally sentences the defendant to death or to life imprisonment.

being asked to undertake. As any trial judge or lawyer can attest, no matter how explicit, clear and unambiguous a court's oral instructions, there is always a risk—indeed a high risk—that jurors will not understand the full scope of their responsibility. People who sit as jurors rarely are trained in the law. Indeed, for most of them, a term of jury duty is probably their first experience in a courtroom.

The punishment of death cannot be taken lightly. The finality of it is awesome. The twelve men and women whose factual findings will ultimately determine whether a fellow human being lives or dies must understand the consequences of their actions. It is not enough that this court, on the basis of a transcript of oral instructions delivered by the trial court, concludes that the jury *probably* understood the task before it. A terrible injustice could go uncorrected if this court were to guess incorrectly, and if the jurors in fact had understood the judge to have the "last word," or that he or she would correct any mistakes they had made. Indeed, in this case, it is necessary to read the trial court's instructions in their entirety in order to conclude that the jury may not have been misled. Several of the trial court's individual instructions informed the jury that the court, and not the jurors, would be solely responsible for the sentencing of the defendant, which suggested that the judge would have the last word on the fate of the defendant.[9]

---

[9] The majority opinion quotes several of these individual instructions in footnote 37 of the majority opinion. They bear repeating here, with slightly different emphasis than the majority attributes to them:

(1) "*Your sole responsibility in this portion of the trial is to decide . . . whether or not [aggravating and mitigating] factors exist,* and then to inform the court of your findings with respect to [such] factors by rendering a special verdict . . . . Thus, although you have been previously made aware of the fact that the defendant's sentence on the capital felony will ultimately depend on your findings, *it's your function to make the required findings and not to designate or impose the sentence. That is a responsibility that is solely vested in me as the judge* . . . ." (Emphasis added.)

(2) "You should clearly understand that in this state *the explicit and*

Therefore, as the majority recognizes, both the trial court and this court must have objective evidence from which we can be absolutely certain that the jurors understood the great and final consequences that would inevitably flow from their factual determinations regarding aggravating and mitigating factors. I agree with the majority that the special verdict form, which must be signed by each juror before it is accepted by the court, must clearly inform the jury of what the trial court will be required to do as a result of the jury's findings.

I am concerned, however, with that aspect of the instruction proposed by the majority that provides that the jury must be unanimous in failing to find an aggravating factor when it unanimously does not find a mitigating factor in order to sentence the defendant to life in prison.[10] Although the dicta in *State* v. *Daniels*, supra, 207 Conn. 388–89, generally supports this instruction, I disagree that the jury must be unanimous in determining that there is no aggravant. Because the death penalty is qualitatively different than any other punishment society can impose, a distinction must be drawn between the state's burden to prove the existence of an aggravating factor beyond a reasonable doubt and the defendant's burden to prove the existence of a mitigating factor by a preponderance of the evidence. A less than unanimous verdict on a mitigating factor raises

---

*limited function of the penalty phase jury is not to impose sentence but is to find the facts upon which the ultimate position of the sentence will prepare."* (Emphasis added.)

(3) *"Even though you will not be expressly deciding the life or death question in this case,* you and you alone will be responsible for determining the existence of factors upon which the defendant's liability, his exposure for the imposition of the death penalty depends." (Emphasis added.)

[10] The majority requires the following language to appear in an introductory statement to the special verdict form: " '[T]he defendant will be sentenced to life imprisonment without the possibility of release if you *unanimously* find that the state has not proved the existence of an aggravating factor beyond a reasonable doubt . . . .' " (Emphasis added.)

a substantial doubt, and no person should be put to death on this basis. Id., 387–88 (rejecting state's claim that the defendant's failure to persuade all jurors that a mitigating factor exists must result in imposition of the death penalty). On the other hand, if the state fails to persuade all of the jurors that an aggravating factor exists, the defendant should not have to endure the ordeal of another sentencing trial. Rather, in such a case, the court should impose a sentence of life imprisonment without the possibility of release.

In my view, the statutory scheme requires that if there is not a unanimous verdict regarding the existence of an aggravant, the issue is put to rest and the trial court must impose a sentence of life imprisonment without the possibility of release. Section 53a-46a makes clear that the only way the death penalty can be imposed is by proceeding in accordance with that section; General Statutes § 53a-46a (a); and that requires in part the decision maker must unanimously determine that an aggravating factor exists. General Statutes § 53a-46a (f); see *State* v. *Daniels*, supra, 207 Conn. 389. Therefore, if a jury fails unanimously to find an aggravating factor, the state has failed to sustain its burden of proof and the judge must sentence the defendant to life in prison. As this court acknowledged in *Daniels*, any other construction of the statute would place "Connecticut alongside a very small minority of jurisdictions with regard to the proper procedure to be followed when the jury cannot unanimously agree." *State* v. *Daniels*, supra, 393.

We must always remember that it is death we are dealing with. "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the

appropriate punishment in a specific case." *Woodson* v. *North Carolina,* 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976).

I respectfully dissent.